**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 95-40678**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**ALEJANDRO N. COVARRUBIAS,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
**(C-95-CR-75-1)**
_____

August 12, 1996

Before KING, JONES, and EMILIO M. GARZA, Circuit Judges:

PER CURIAM:[1]

Defendant Alejandro N. Covarrubias ("Covarrubias") appeals his conviction for knowingly and willfully attempting to export weapons from the United States to Mexico without obtaining a license from the Office of Defense Trade Controls in violation of 22 U.S.C. §§ 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1(a)(1). Because this court concludes that the evidence

---

[1] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

presented at trial was sufficient to support the jury's guilty verdict, Covarrubias's conviction is AFFIRMED.

## FACTUAL BACKGROUND

Covarrubias was pulled over by Robstown, Texas, Police Officer Albert Stout ("Stout") on March 19, 1995 for failing to display a front license plate and for a malfunctioning taillight on his late model Chevrolet dually pickup truck.[2] As Stout approached the vehicle, he noticed a gas filler hose protruding from near the left double-rear tires of the truck and also detected the odor of fresh paint in this area.

Officer Stout began to inquire about Covarrubias's truck and his destination; the two conversed primarily in Spanish. Stout immediately noticed that Covarrubias was very nervous, gripping the steering wheel tightly with both hands, avoiding eye contact, and speaking in a low, stammering voice. Furthermore, Covarrubias responded inconsistently to Stout's inquiries regarding his destination. For instance, Covarrubias initially responded that he was traveling from Dallas, Texas to Matamoros, Mexico, to visit his father; subsequently, however, he claimed that he was actually traveling to visit his brother in Mexico and that his father had been dead for five years. Covarrubias also assured Stout during

_____

[2] Covarrubias was stopped on Highway 77, which comes within approximately one-half mile from the American border with Mexico.

2

their conversation that his truck had been painted over a year ago, that it had working dual fuel tanks, and that the hose protruding from the truck was merely a homemade valve designed to fix the truck's broken fuel switch. When asked to demonstrate the use of this homemade valve, Covarrubias suggested that the makeshift fuel switch was not yet operational.

Confronted with a myriad of inconsistent and suspicious information, Stout requested that Covarrubias step outside his pickup as Stout prepared a citation for the vehicle violations. After giving Covarrubias the citation, Stout informed Covarrubias that he was free to leave, but also sought consent to search the pickup truck, expressing misgivings about what Covarrubias might be carrying. Covarrubias provided both oral and written consent to the search.

Officer Stout's search of the vehicle revealed that the gas tank hose was not connected to the left tank and that this tank sounded solid when hit. After securing the assistance of a wrecker service, Stout and another officer, Danny Flores ("Flores"), supervised the mechanic's removal of the left fuel tank from the truck. When the tank was opened, the officers discovered a camouflage flak jacket, ammunition, several firearms,[3] and various

---

[3] During trial, the parties stipulated that the following firearms found in the gas tank are listed on the United States Munitions List and require an individual to obtain a permit from the Office of Defense Trade Controls before exporting such weapons: a Commando Arms .9 millimeter rifle; an Interarms .22 caliber; a Springfield .22 caliber rifle; a Smith & Wesson .357 caliber revolver; as well as .25 caliber, .357 caliber, .44 caliber, and .38 caliber ammunition.

3

weaponry paraphernalia.

The officers read Covarrubias his constitutional rights and placed him under arrest. While in transit to the police station, Covarrubias offered the explanation that he was traveling to Mexico in order to give the firearms to relatives because his girlfriend would no longer tolerate the guns in their house.

Later that afternoon, Covarrubias waived his rights and agreed to an interview with Customs Special Agent Monte Price ("Price"). Stout was present during the interview and testified that Price asked Covarrubias if he knew that it was illegal to move the firearms to Mexico, and Covarrubias answered that "he knew that it was illegal to cross them without notifying the proper authorities," both in the United States and Mexico. Stout further testified that Covarrubias explained that he had no intention of reporting the firearms to any border authorities whatsoever, and that he had hidden the weapons in the fuel tank in order to conceal them "from the Mexican and American police." Covarrubias also expressed relief that he was arrested in the United States, since he feared retribution from Mexican law enforcement.

One of the translators assisting in Price's interview of Covarrubias was Police Officer Jesse Garcia ("Garcia"). Garcia testified that Covarrubias explained during the interview that he had resided in the United States for approximately fifteen years and that he had not been in Mexico during the last eight to ten

4

years.  Covarrubias also represented that he owned the pickup truck in which the weapons had been concealed and that he had purchased these firearms in Grand Prairie, Texas, and in Dallas.  Garcia further testified that Covarrubias told Price that he had hidden the firearms in the fuel tank "[b]ecause he knew it was illegal to transport the weapons across into Mexico and he didn't want to get caught . . . [since] it was illegal under U.S. law."  Garcia recalled that Covarrubias, who "kept repeating that it was against the law to transport [the firearms] out of the country," stated that he did not intend to declare the firearms to authorities at either border and admitted that he did not have a permit which would enable him to transport the weapons out of the United States.

Although Garcia testified that the interview included references to the licensing requirements under American law, he admitted that Covarrubias was not shown the official Munitions List, detailing those items for which an export permit from the Office of Defense Trade Controls is required.  Rather, as Garcia explained, "[t]he only thing that we, I asked him was one of the questions that Agent Price asked him and it was if he knew it was against the law and that he needed to declare [the weapons] . . . and he said yes, he knew it was against the law . . . ."  However, Garcia also testified that Covarrubias understood the illegality of transporting the weapons to Mexico, noting that Covarrubias "stated that . . . he knew it was against the law to just transport the weapons out of the country into Mexico."

5

Agent Price corroborated the testimony of the other officers, explaining that Covarrubias admitted that he did not intend to declare the concealed firearms at the U.S. border because "he knew it was against the law for him to take the weapons into Mexico and he did not want to be hindered in his attempts to get the guns into Mexico." Covarrubias also acknowledged that he did not have approval from any American authorities to transport the firearms into Mexico and that "[h]e knew it was against . . . U.S. law not to declare these weapons to U.S. Customs."

Other evidence adduced at trial demonstrated that, despite his claim that he had not traveled to Mexico during the last eight to ten years, Covarrubias owned another vehicle that had crossed into Mexico four times in March of 1993 and once in March of 1994. At each of those border crossings, signs were prominently displayed that both explained the requirement to declare to the U.S. Customs Service all firearms, firearm hardware, and ammunition and warned that it would be unlawful to export such items without obtaining the required license or written approval.

After the government rested its case against Covarrubias, he moved for judgment of acquittal contending that the government had failed to prove that he had the requisite knowledge of the statutory duty to obtain a license or written approval before attempting to leave the United States with weapons listed on the Munitions List. The district court denied the motion and, after the jury convicted Covarrubias, sentenced him to serve 15 months of

6

imprisonment.

**DISCUSSION**

Covarrubias contends that the evidence was insufficient to sustain his conviction for willfully attempting to export without a license firearms on the United States Munitions List because the government did not demonstrate that he had knowledge of the duty to obtain such authorization. As this court has frequently explained, when considering the sufficiency of the evidence underlying a conviction,

> [i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (*en banc*), *aff'd,* 462 U.S. 356, 103 S. Ct. 2398 (1983). The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the government. *Id.*

To sustain a conviction under 22 U.S.C. § 2778, the government must prove beyond a reasonable doubt that the defendant willfully exported or attempted to export defense articles that are on the United States Munitions List without a license. *See United States v. Ortiz-Loya,* 777 F.2d 973, 980 (5th Cir. 1985); *United States v. Murphy,* 852 F.2d 1, 6 (1st Cir. 1988). Hence, the statute requires the government to prove that the defendant acted

7

with specific intent to violate a known legal duty. *United States v. Hernandez,* 662 F.2d 289, 292 (5th Cir. 1981).

Covarrubias contends that the government has not sufficiently proved that he acted with specific intent because the government's evidence demonstrates only a general awareness of the illegality of his conduct and falls short of establishing that he was aware of the United States Munitions List or of the duty to obtain a license in order to export the items listed on it. To buttress this contention, Covarrubias relies on this court's decision in *Hernandez.* In that case, this court reversed the defendant's conviction for willfully exporting weapons on the Munitions List because the government had failed to prove that the defendant had voluntarily and intentionally violated a known legal duty; put differently, the government did not demonstrate specific intent. *Hernandez,* 662 F.2d at 291-92. We concluded that the evidence was not sufficient to demonstrate specific intent, and emphasized that "[w]hile it is true that Hernandez' concealment of the weapons possibly supported a jury finding that he knew his conduct was unlawful, such a finding falls short of deciding that he knew he was unlawfully exporting weapons on the Munitions List." *Id.* at 292 (citations omitted).

But Covarrubias's reliance on *Hernandez* is misplaced. Unlike in *Hernandez,* the jury in the instant case had ample evidence from which it could have reasonably concluded that

8

Covarrubias knowingly attempted to export weapons on the Munitions List without obtaining either the required license or authorization.[4] For instance, the government presented extensive and uncontroverted evidence detailing Covarrubias's efforts to conceal the weapons in a gas tank of his truck. Furthermore, Covarrubias made several inconsistent and incriminating statements before, during, and after his arrest that demonstrate his knowledge that export of the concealed weapons was unlawful. Covarrubias also admitted that he had no intention of declaring the weapons concealed in the gas tank of his truck to authorities on either side of the border because he knew that it was illegal to transport the weapons into Mexico. Finally, despite his insistence to the contrary, Covarrubias owned a vehicle that had crossed the border at regulated ports of entry on at least five occasions since 1993. The government proved at trial that the United States Customs Service displays large signs at these ports of entry that detail the requirement that a license or other form of express authorization is needed before articles on the United States Munitions List can be exported to Mexico. Viewing this evidence and the other evidence adduced at trial as well as the reasonable inferences in the light most favorable to the government, the

---

[4] In *Hernandez*, the only evidence the government introduced at trial demonstrated that the defendant had purchased several weapons from dealers in El Paso, had concealed them under the hood of his car, and had attempted to cross the Stanton Street International Bridge into Juarez, Mexico with the hidden weapons. *Hernandez*, 662 F.2d at 290-91.

evidence was sufficient to support the jury's conclusion that Covarrubias knew that either a license or other form of authorization was required before he could transport the weapons hidden in his gas tank into Mexico.[5]

## CONCLUSION

For the foregoing reasons, the evidence is sufficient to support the jury's verdict and Covarrubias's conviction is **AFFIRMED.**

---

[5] The district court reached a similar conclusion when it denied the defendant's motion for acquittal, observing that the evidence at trial was sufficient to "give to the jury enough basis upon which they could find that [Covarrubias] was aware of his known legal duty."

10