

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-12-2005

# USA v. Brodie

Precedential or Non-Precedential: Precedential

Docket No. 02-2662

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Brodie" (2005). *2005 Decisions.* Paper 1282.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1282

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 02-2662

———

UNITED STATES OF AMERICA,

Appellant

v.

STEFAN E. BRODIE

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 00-cr-00629-1)
District Judge:  Honorable Mary A. McLaughlin

———

Argued October 26, 2004
Before:  McKEE, FISHER, and BECKER, *Circuit Judges*.

(Filed:    April 12, 2005)

Joseph G. Poluka (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
        *Attorney for Appellant*

Gregory B. Craig (Argued)
William T. Burke
Williams & Connolly
725 12th Street, N.W.
Washington, DC  20005
        *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Defendant Stefan E. Brodie was found guilty by a jury of conspiring to trade with Cuba in violation of the American Cuban embargo currently in place under the provisions of the Trading with the Enemy Act of 1917 ("TWEA") and the Cuban Assets Control Regulations ("CACRs").  The United States District Court for the Eastern District of Pennsylvania, ruling on a previously reserved motion for judgment of acquittal, thereafter acquitted the Defendant on the ground that there was insufficient evidence of his knowing and willful participation in the charged conspiracy to support conviction. *United States v. Brodie*, 268 F. Supp. 2d 408 (E.D. Pa. 2002).  After reviewing the government's evidence against the Defendant, we conclude that the District Court erred in entering the judgment of acquittal, and accordingly, we vacate the judgment, reinstate the jury verdict, and remand for further proceedings which may, on the present record, include a new trial.

## I.  BACKGROUND

### A.  The American Cuban Embargo

The backdrop for this appeal is the American Cuban embargo against trading with Cuba which derives in the first instance from the TWEA, 50 U.S.C. App. § 1 *et. seq*.  The TWEA as originally enacted dealt only with the President's use of economic powers in times of war, but was expanded in 1933 to deal with national emergencies that arose during peacetime.  *See Regan v. Wald*, 468 U.S. 222, 226 n.2 (1984).  Section 5(b) of the TWEA, in pertinent part, authorizes the President, through a designated agency, to "investigate, regulate, ... or prohibit ... transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. App. § 5(b)(1)(B).[1]  Section 16, in turn, criminalizes willful violation of any "order of the President issued in compliance with the provisions of th[e TWEA]."  50 U.S.C.App.

---

[1]TWEA Section 5(b) was amended in 1977 to limit the President's authority once again to times of war, but the same law containing that limitation (i.e., The International Emergency Economic Powers Act ("IEEPA")) also grand-fathered existing exercises of the President's national emergency authority (including the American Cuban embargo) and permitted the President to extend their exercise in one year intervals where in the national interest.  The Cuban Liberty and Democratic Solidarity Act (popularly known as LIBERTAD), enacted in 1996, continued the Cuban embargo indefinitely and effectively suspended the IEEPA's requirement that the President revisit the basis for the American Cuban embargo each year.  *See* 22 U.S.C. §§ 6021-6091; *see also United States v. Plummer*, 221 F.3d 1298, 1307-1308 & n.6 (11th Cir. 2000) (reviewing this history).

§ 16. Presidential authority under the TWEA has been delegated to the Secretary of the Treasury, who has in turn delegated that authority to the Office of Foreign Assets Control ("OFAC"). *See Regan*, 468 U.S. at 226 n.2 (citing Exec. Order No. 9193, 3 C.F.R. 1174, 1175 (1942) and Treasury Department Order No. 128 (Rev. 1, Oct. 15, 1962)). In 1963, the CACRs were promulgated pursuant to TWEA Section 5(b) to impose an embargo against Cuba in an effort "to deal with the peacetime emergency created by Cuban attempts to destabilize governments throughout Latin America." *Regan*, 468 U.S. at 226. The CACRs incorporated and expanded upon prior economic sanctions already imposed against Cuba. *See id.* at 226 & n.4.

Of particular importance to this appeal is CACR § 515.201(b) which provides:

> (b)    All of the following transactions are prohibited except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part,[2] or any national

---

[2]CACR § 515.201(d) provides:

For the purposes of this part, the term 'foreign country designated under this part' and the term 'designated foreign country' mean Cuba and the term 'effective date' and the term 'effective date of this section' mean with respect to Cuba, or any national thereof, 12:01 a.m., e.s.t., July 8, 1963.

4

thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

*See* 31 C.F.R. § 515.201(b) (2005); *see also* 31 C.F.R. § 515.201(b) (1992); 31 C.F.R. § 515.201(b) (1993); 31 C.F.R. § 515.201(b) (2000). As CACR § 515.201(b) suggests, business transactions involving Cuba may be specifically authorized by OFAC; here, however, it is uncontested that no such authorization was ever obtained for the business transactions that gave rise to the underlying prosecution.

The phrase "person subject to the jurisdiction of the United States" as used in CACR § 515.201(b) is defined in CACR § 515.329, 31 C.F.R. § 515.329, which provided, at the time the conspiracy charged in this case was allegedly in effect:

---

31 C.F.R. § 515.201(d) (2005).

The term 'person subject to the jurisdiction of the United States' includes:

(a) Any individual, wherever located, who is a citizen or resident of the United States;

(b) Any person within the United States as defined in § 515.330;

(c) Any corporation organized under the laws of the United States or of any State, territory, possession, or district of the United States; and

(d) Any corporation, partnership, or association, wherever organized or doing business, that is *owned or controlled by persons* specified in paragraphs (a) or (c) of this section.

31 C.F.R. § 515.329 (1993) (emphasis added); *see also* 31 C.F.R. § 515.329 (2000); 50 Fed. Reg. 27435 (July 3, 1985).[3]  The critical

[3]Effective March 24, 2003, CACR § 515.329 was revised to provide:

(c) Any corporation, *partnership, association, or other organization* organized under the laws of the United States or of any State, territory, possession, or district of the United States; and
(d) Any corporation, partnership, association, or other organization, wherever organized or doing business, that is owned or controlled by persons specified in paragraphs (a) or (c) of this section.

6

phrase "owned or controlled" in CACR § 515.329(d) is not defined in the CACRs, but notably, the CACRs have included a broad "person subject to the jurisdiction of the United States" feature from their inception. *See* 28 Fed. Reg. 6974, 6978 (July 9, 1963) (CACR § 515.329).

The effect of the prohibition against entities "owned or controlled by persons specified in [31 C.F.R. § 515.329 (a) or (c)]" from undertaking any of the transactions prohibited by CACR § 515.201(b), was substantially muted in prior years by a regulatory exemption permitting foreign subsidiaries of companies owned or controlled by American citizens to trade with Cuba under certain conditions, as well as liberal application of the licensing provision by OFAC. *See* 31 C.F.R. § 515.559 (1975); 40 Fed. Reg. 47108 (Oct. 8, 1975).[4] *See also* Ralph H. Folsom,1 INT'L BUS. TRANS. § 18.4 (2d ed. 2004); Harry L. Clark, "Dealing with U.S. Extraterritorial Sanctions and Foreign Countermeasures," 20 U. PA. J. INT'L ECON. L. 61, 66 & n. 14 (Spring 1999); John Ellicott, "Between a Rock and a Hard

---

31 C.F.R. § 515.329 (2005) (emphasis added).

[4]The regulatory exemption was contained in CACR § 515.559 ("Transactions by American-owned or controlled foreign firms with Cuba") which provided:

> (A) Specific licenses will be issued in appropriate cases for certain categories of transactions between U.S.-owned or controlled firms in third countries and Cuba, where local law requires, or policy in the third country favors, trade with Cuba. The categories include: [listing categories] ...

31 C.F.R. § 515.559 (1975).

Place: How Multinational Companies Address Conflicts Between U.S. Sanctions and Foreign Blocking Measures," 27 STETSON L. REV. 1365, 1368 (Spring 1998). Thus, in the latter part of the 1970's and throughout the 1980's, "U.S. subsidiaries abroad developed significant trade with Cuba." 1 INT'L BUS. TRANS. §18.4.

In 1992, Congress enacted the Cuban Democracy Act, Act of Oct. 23, 1992, 106 Stat. 2575, codified at 22 U.S.C. §§ 6001-6010, which, *inter alia*, rescinded OFAC's authority to issue licences for the export of goods to Cuba by "persons subject to the jurisdiction of the United States." *See* 22 U.S.C. § 6005(a) (popularly known as the "Mack Amendment"). *See also* Clara David, "Trading With Cuba: The Cuban Democracy Act and Export Rules," 8 FLA. J. INT'L Law 385 (Fall 1993) (author, then a licensing officer for OFAC, stating that the Cuban Democracy Act eliminated the prior exemption to the Cuban embargo for trade by foreign subsidiaries of American firms). The Cuban Democracy Act took effect on October 23, 1992, and the CACRs were subsequently amended to reflect the Act's strict provisions. *See* 31 C.F.R. § 515.559 (1993).[5] In March 1996,

_____

[5]CACR § 515.559 currently provides, in pertinent part:

(a) Effective October 23, 1992, no specific licenses will be issued pursuant to paragraph (b) of this section for transactions between U.S.-owned or controlled firms in third countries and Cuba for the exportation to Cuba of commodities produced in the authorized trade zone or for the importation of goods of Cuban origin into countries in the authorized trade zone, unless, in addition to meeting all requirements of paragraph (b), one or more of the following conditions are satisfied:
    (1) The contract underlying the proposed

Congress further strengthened the American Cuban embargo by enacting the LIBERTAD. Pub. L. No. 104-114, 110 Stat. 785 (1996), codified at 22 U.S.C. §§ 6021-6091 (also known as the "Helms-Burton Act"). The LIBERTAD mandates that the American Cuban embargo, including all restrictions imposed by the CACRs, "remain in effect" unless and until the embargo is suspended or terminated in accordance with statutory procedures. 22 U.S.C. § 6032(h) (cross-referencing 22 U.S.C. § 6064 ("Termination of the economic embargo of Cuba")). Such procedures, in turn, make suspension or termination of the embargo contingent upon a change of political power in Cuba. *See* 22 U.S.C. § 6064; *see also* 22 U.S.C. § 6065. Numerous countries, including the European Union, Canada and Mexico, reacted to the strengthening of the American Cuban

transaction was entered into prior to October 23, 1992;

(2) The transaction is for the exportation of medicine or medical supplies from a third country to Cuba, which shall not be restricted [except under certain laws or in certain cases];

(3) The transaction is for the exportation of telecommunications equipment from a third country, when the equipment is determined to be necessary for efficient and adequate telecommunications service between the United States and Cuba.

(b) Specific licenses will be issued in appropriate cases for certain categories of transactions between U.S.-owned or controlled firms in third countries and Cuba, where local law requires, or policy in the third country favors, trade with Cuba. The categories include [listing categories]. ...

31 C.F.R. § 515.559 (2005).

embargo, and its purported application to American subsidiaries abroad, by enacting countermeasures (often called "blocking statutes" or "blocking orders"). *See, e.g.*, Clark, "Dealing with U.S. Extraterritorial Sanctions," 20 U. Pa. J. Int'l Econ. L. at 81-87.[6] With this background, we turn now to the present appeal.

## B. The Indictment

The Defendant Stefan E. Brodie and his brother Donald B. Brodie ("Don Brodie") were co-owners of The Bro-Tech Corporation, an entity incorporated in Delaware, which manufactured and sold ion exchange resins for industrial use in water purification under the trade name "The Purolite Company." The Bro-Tech Corporation was headquartered in Bala Cynwyd, Pennsylvania, and had a manufacturing plant and warehouse facility located in Philadelphia, Pennsylvania. The Defendant was the president of The Bro-Tech Corporation; his brother Don Brodie was the vice-president. Purolite product was sold by salesmen operating from sales offices located throughout North America, including one in Ontario, Canada ("Purolite Canada") from which James E. Sabzali ("Mr. Sabzali"), a Canadian citizen, worked from approximately 1990 to 1995 until promoted to a marketing position based in the Bala Cynwyd office.

The Defendant, Don Brodie and The Bro-Tech Corporation owned, in approximately 1/3 shares, another corporation known as

---

[6]The American Cuban embargo's purported extraterritorial reach has been criticized by numerous commentators. *See, e.g.*, Clark, "Dealing with Extraterritorial Sanctions," 20 U. Pa. J. Int'l Econ. L. 61; Ellicott, "Between a Rock and a Hard Place," 27 Stet. L. Rev. 1465; Kam S. Wong, "The Cuban Democracy Act of 1992: The Extraterritorial Scope of Section 1706(a)," 14 U. Pa. J. Int'l Bus. L. 651 (Winter 1994).

Bro-Tech Limited, which was incorporated in the United Kingdom.[7] Bro-Tech Limited was the parent company of "Purolite International Limited," which was also incorporated in the United Kingdom, and manufactured ion exchange resins at a facility located in Pontyclun, South Wales. Purolite International Limited (alternatively called "the U.K. entity" herein to differentiate it from "The Purolite Company" or the "U.S. entity") had its own board of directors, sales people, and finance department. The Brodie brothers, however, ultimately owned and controlled the U.K. entities as well as the U.S. entities.

In late 1996-early 1997, the United States Customs Service (which investigates illegal exports on behalf of OFAC) received information leading it to suspect that The Purolite Company was trading in violation of the American Cuban embargo. Customs agents thereafter met with a Purolite official at the Bala Cynwyd office on February 5, 1997, and, following some initial exchange of documents between the agents and the company, a prosecutor was assigned and grand jury subpoenas were issued to the company. On October 5, 2000, a grand jury indicted the Defendant, Don Brodie, The Bro-Tech Corporation d/b/a/ "The Purolite Company," and Mr. Sabzali on a single count of conspiracy to violate 18 U.S.C. § 371 (criminalizing the act of "conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof") and 18 U.S.C. § 2 (criminalizing the act of "aid[ing] and abet[ting] the commission of a crime against the United States") by engaging in transactions involving property with Cuba in contravention of the

---

[7]Together, the Defendant, Don Brodie and The Bro-Tech Corporation owned 95% of the shares in Bro-Tech Limited; 5% of the shares were owned by a third-party.

TWEA, 50 U.S.C. App. §§ 5(b) & 16,[8] and CACR § 515.201(b), 31 C.F.R. § 515.201(b). The conspiracy was alleged to have existed from approximately April 1993 to May 2000. Overt acts in furtherance of the conspiracy were alleged to have begun on or about June 21, 1994 and to have ended on or about July 31, 1999. The overt acts involved the sale of ion exchange resins, payment for the product, and the payment of expenses related to business travel undertaken by Don Brodie, Mr. Sabzali and others to, from and within Cuba. Additionally, the grand jury indicted Don Brodie, The Bro-Tech Corporation, and Mr. Sabzali for 76 additional substantive violations of the TWEA and CACRs tied to specific sales of Purolite

---

[8]Section 16 of the TWEA provides:

Whoever shall willfully violate any of the provisions of this Act [sections 1 to 6, 7 to 39 and 41 to 44 of this Appendix] or of any license, rule, or regulation issued thereunder, and whoever shall willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of the Act [said sections] shall, upon conviction, be fined not more than $1,000,000, or if a natural person, be fined not more than $100,000, or imprisoned for not more than ten years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall, upon conviction, be fined not more than $100,000 or imprisoned for not more than ten years or both.

50 U.S.C. App. § 16(a) (West 2004) (brackets in the original).

12

product and expense-related transactions.[9]   The Defendant was charged only with conspiracy to violate the TWEA and CACR § 515.201(b) as alleged in the first count of the indictment.

### C.        Proceedings Below

The District Court denied numerous pre-trial defense motions to dismiss the indictment.  In particular, on August 14, 2001, the District Court denied motions to dismiss the indictment based on (1) an alleged inconsistency between the CACRs and Section 620(a) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2370, and President Kennedy's February 3, 1962 Proclamation 3447 (27 Fed. Reg. 1085); (2) an alleged failure of President Kennedy to declare a national emergency with respect to Cuba; (3) an alleged unconstitutional delegation of legislative powers to the Executive Branch by Section 5(b) of the TWEA; and (4) an alleged termination of the President's authority under Section 5(b) of the TWEA due to the fact that the exercise of that authority by President George H.W. Bush on September 13, 1991, was not published in the Federal Register until September 23, 1991.  Additionally, on October 24, 2001, the District Court denied motions to dismiss all or parts of the indictment based

---

[9]A fifth defendant, John H. Dolan, former director of purchasing for The Purlolite Company with whom the Customs agents met in the Bala Cynwyd office in February 1997, was also indicted for one count of making false statements to government officials in violation of 18 U.S.C. § 1001(a).  Mr. Dolan's trial was severed from that of his co-defendants, and he later pleaded guilty to a superceding information charging one count of concealing information on imported articles and containers in violation of 19 U.S.C. § 1304(a).  Mr. Dolan was sentenced to six months probation and fined $2,000.

13

on principles of international comity, the foreign sovereign compulsion doctrine[10] and lack of jurisdiction.

The four defendants, each separately represented by counsel, were then tried together in a single trial.  At the close of the government's evidence, the Defendant made a motion pursuant to Fed.R.Crim.P. 29(a) for judgment of acquittal.  The District Court reserved the motion pursuant to Rule 29(b),[11] and the defense thereafter put on its case.  In charging the jury, the District Court gave a willful blindness instruction over the objection of the defense, thereby instructing the jury that it could find the knowledge element of the crime to be satisfied if it concluded beyond a reasonable doubt that the Defendant had deliberately closed his eyes to what otherwise

---

[10]*See Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979) (explaining, in the context of an antitrust action, that "[t]he sovereign compulsion defense is not principally concerned with the validity or legality of the foreign government's order, but rather with whether it compelled the American business to violate American antitrust law.").

[11]Fed.R.Crim.P. 29(b) provides:

Reserving Decision.  The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

would have been obvious to him concerning the facts in question.[12] The jury then found all defendants guilty of the conspiracy charge in Count I. Additionally, Don Brodie was found guilty of 33, The Bro-Tech Corporation of 44, and Mr. Sabzali of 20, of the separate substantive counts related to specific sales of Purolite product and expense-related transactions.[13] The jury also found The Bro-Tech Corporation subject to a forfeiture of $665,737.

Following post-trial briefing and oral argument, the District Court on May 31, 2002, granted the Defendant's motion for judgment of acquittal on the ground that there was insufficient evidence from which the jury could have concluded beyond a reasonable doubt that the Defendant had knowingly and willfully participated in the conspiracy. 268 F. Supp. 2d 408. In granting the motion, the District Court reasoned that the government's evidence showed the Defendant did not know it was unlawful under the CACRs for Purolite International Limited, incorporated in and operating from the United Kingdom ("U.K. entity"), to trade with Cuba if The Purolite Company, incorporated in and operating from the United States ("U.S. entity"), was not involved. *See id.* at 417. Additionally, the District Court reasoned that, to the extent the government had proven that the U.S. entity was actually involved in particular transactions, the evidence also showed the Defendant was unaware of such involvement. *See id.* The government filed the present appeal.

---

[12]*See United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999).

[13]Don Brodie, The Bro-Tech Corporation and Mr. Sabzali were acquitted on all counts involving sales made in the time period of 1997-1999, four of the sales made in 1996 and three of the sixteen counts involving expense-related transactions.

15

Approximately a year later, the District Court denied the motions for judgment of acquittal filed by Don Brodie, The Bro-Tech Corporation and Mr. Sabzali, finding their convictions (including those for conspiracy to violate the TWEA and CACRs) supported by sufficient evidence. *United States v. Brodie,* 268 F. Supp. 2d 420, 423-424 (E.D. Pa. 2003). However, in that same ruling, the District Court also granted all four defendants a new trial on the ground that the government had made certain improper and inflammatory comments and argument during its opening and closing statements which prejudiced the jury. *See id.* at 424-35. Importantly, the District Court granted a new trial for the Defendant conditional on the outcome of the pending appeal. *See id*. at 436. The government appealed also from the order granting a new trial, and that appeal was consolidated by this Court with the present appeal. Thereafter, on October 15, 2003, this Court granted the government's motion to remand the appeal taken from the grant of a new trial to allow the District Court to consider the guilty pleas of Don Brodie, The Bro-Tech Corporation and Mr. Sabzali.[14] The District Court then dismissed all remaining counts of the indictment as to these three defendants, and the government voluntarily dismissed its appeal of the order granting a new trial. Thus, the only issue before this Court is the propriety of the judgment acquitting the Defendant.

---

[14]Subsequently, Don Brodie pleaded guilty to Count 36 of the indictment (involving his approval of expenditures in the amount of $4,187 for Mr. Sabzali's Cuba-related travel) and was sentenced to one year probation and fined $10,000. The Bro-Tech Corporation also pleaded guilty to Count 36 of the indictment, and was fined $250,000. Mr. Sabzali pleaded guilty to a superceding information charging a violation of 18 U.S.C. § 2 (aiding and abetting) and § 545 (smuggling goods into the United States), and was sentenced to one year probation and fined $10,000.

16

## II. STANDARD AND SCOPE OF REVIEW

In ruling on a motion for judgment of acquittal made pursuant to Fed.R.Crim.P. 29, a district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir. ) (en banc) (trial court usurped jury function by deciding contested issues of fact), *cert. denied*, 457 U.S. 1106 (1982); *see also* Charles A. Wright, 2A FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury."). On appeal from the grant or denial of a motion for judgment of acquittal, this Court exercises plenary review and independently applies the same standard as the district court. *See United States v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987); *Jannotti*, 673 F.2d at 598.[15]

---

[15]The Defendant urges this Court not to view the evidence in the light most favorable to the government in conducting our review due to the prosecutorial misconduct which, *inter alia*, gave rise to the grant of a new trial. We reject this invitation as based on a fundamental misunderstanding of the standard, as this Court is not

Our scope of review is dictated by the procedural posture in which this case comes before us.  The Defendant moved for a judgment of acquittal at the close of the government's case pursuant to Fed.R.Crim.P. 29(a), and the District Court reserved decision on the motion under Fed.R.Crim.P. 29(b).  Accordingly, the District Court was required to, and properly did, determine whether an acquittal was appropriate based solely on the evidence presented by the government.  *See* Fed.R.Crim.P. 29(b) ("[i]f the [trial] court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved").  The Advisory Committee Notes to the 1994 Amendments to Fed.R.Crim.P. 29 provide that an appellate court, reviewing a judgment of acquittal under Fed.R.Crim.P. 29(b), is "similarly limited."  Advisory Committee Notes to 1994 Amendments.  Thus, in reviewing the judgment of acquittal entered below, we too will examine only to the evidence presented in the government's case, which includes evidence elicited on cross-examination of the government witnesses, but not evidence presented in the defense case.  *See id*.; *see also United States v. Finn*, 375 F.3d 1033, 1037 (10th Cir. 2004).

The elements of conspiracy – i.e., "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense" – can be proven entirely by circumstantial evidence.  *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.), *cert. denied*, 475 U.S. 1024 (1986); *see also Smith*, 294 F.3d at 477 (listing requirements for conspiracy and principle that they may be proven entirely by circumstantial evidence); *United States v. Fuentes-Coba*, 738 F.2d 1191, 1196 (11th Cir. 1984) (listing same factors for conspiracy under the TWEA), *cert. denied*, 469 U.S. 1213 (1985).

---

viewing the evidence in the light most favorable to the jury verdict entered below.

Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence. *See, e.g.*, *Blumenthal v. United States*, 332 U.S. 539, 557 (1947) (because "[s]ecrecy and concealment are essential features of successful conspiracy," the law "rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others"). Thus, "[t]he existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (quoting *Kapp*, 781 F.2d at 1010)) (ellipsis in the original).

We must, however, give "close scrutiny" to the sufficiency of the government's evidence in a conspiracy case, *see Coleman*, 811 F.2d at 807, for the reasons that "[s]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict," *id.* at 808, and "guilt must remain personal and individual." *United States v. Samuels*, 741 F.2d 570, 575 (3d Cir. 1984). Conspiracy cannot be proven "by piling inference upon inference" where those inferences do not logically support the ultimate finding of guilt. *Coleman*, 811 F.2d at 808.

In conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole. "The court must determine 'whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt.'" *Coleman*, 811 F.2d at 807 (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957)). *See also United States v. United States Gypsum Co.*, 600

19

F.2d 414, 417 (3d Cir. 1979) ("'[T]he character and effect of a conspiracy (is) not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (quoting *United States v. Patten*, 226 U.S. 525 (1913)) (parenthesis in the original). "To sustain a conspiracy conviction, the 'contention that the evidence also permits a less sinister conclusion is immaterial. ... [T]he evidence need not be inconsistent with every conclusion save that of guilt.'" *Smith*, 294 F.3d at 478 (quoting *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998)).

## III. DISCUSSION

The bulk of the evidence presented by the government during the joint trial of the Defendant and his three indicted co-conspirators did not directly involve the Defendant's participation in the underlying conspiracy, but rather the accomplishment of particular illegal acts by Don Brodie and Mr. Sabzali. The District Court, in ruling on the Defendant's motion for judgment of acquittal, noted that the Defendant and the government had agreed during oral argument on the motion that:

> a reasonable jury could find that [The] Bro-Tech [Corporation] made the following sales to Cuba through intermediaries ...
>
> 1. From 1992 to 1993, four sales were made by Bro-Tech through a Canadian company. The sales were booked at Bro-Tech, and the product was manufactured by and shipped from Purolite International. These sales were not charged in the indictment.

20

2. From 1994 to 1996, thirty-five sales were made by Bro-Tech through intermediaries in Canada and Mexico. At times the product sold was manufactured by and shipped from Bro-Tech, and at other times Purolite International.

3. From 1997 to 1999, twenty-four sales were made by Bro-Tech through the intermediary San Marco. All sales in this period were booked at Purolite International, and the product was manufactured by and shipped from Purolite International.

268 F. Supp. 2d at 410-11. The fact that these sales transactions occurred, and the manner in which they were booked, manufactured and shipped, is important background to the evidence presented against the Defendant, but rather than set forth the evidence which would support these facts, we too will incorporate this list of proven transactions accepted by the District Court. *See id.*

Against the Defendant, the government presented what we will categorize as six key pieces of circumstantial evidence: (1) the basic company structure; (2) the "billing instruction," and series of events related to the 1992 audit of The Bro-Tech Corporation; (3) the "our friends in the Caribbean" speech; (4) Mr. Sabzali's 1995 performance review; (5) the pervasive use of "code words" for Cuba by employees of The Bro-Tech Corporation d/b/a/ The Purolite Company; and (6) several post-investigation events. This evidence is set forth in Section III.A of this opinion. In Section III.B, because we recognize that further proceedings on remand may include a new trial, we clarify the intent requirement for conspiracy to violate the TWEA and CACRs, and address the efficacy of the Defendant's intent-based defense which posited that he did not understand it was unlawful for the U.K. entity to trade with Cuba and/or did not know

21

that the U.S. entity was actually involved in the trading. In Section III.C, we assess the government's evidence against the Defendant as a comprehensive whole and in the light most favorable to the government as required by the governing standard.

## A. The Evidence Against The Defendant

### 1. Basic company structure

As noted above, the Defendant was the President and co-owner with his brother Don Brodie of The Bro-Tech Corporation, d/b/a "The Purolite Company." Together with The Bro-Tech Corporation, the Defendant and Don Brodie also owned, in approximately 1/3 shares, Bro-Tech Limited, which was incorporated in the United Kingdom. Bro-Tech Limited, in turn, controlled Purolite International Limited, which was also incorporated in the United Kingdom. Both the U.S. and the U.K. entities were controlled by the Brodies. The Bro-Tech Corporation made over $2.1 million dollars in gross income from its trade with Cuba.

In his capacity as President, the Defendant oversaw the finances of The Bro-Tech Corporation and Purolite International Limited, had direct supervision of Edward Grossman (who was The Bro-Tech Corporation's Chief Financial Officer), and served as the primary contact for legal counsel to the company. The Defendant also oversaw the European sales force, while Don Brodie oversaw the North American sales force and Philadelphia manufacturing facility. Edward Nace, a former products manager for The Purolite Company from 1993 to 1997 who worked from the Bala Cynwyd office as a liaison between sales and manufacturing, testified that both the Defendant and Don Brodie reviewed on a "fairly frequent[]" basis the hard-copy log book of daily purchase orders kept at the Bala Cynwyd office, which listed customer name, type and quantity of product

22

ordered. Later, when the company switched to a computerized system, both brothers would review the daily "edit reports" listing orders.

The office in Bala Cynwyd was located on one part of one floor in an office building that housed numerous other companies. Approximately 30 employees worked in the Bala Cynwyd office, including both the Defendant and Don Brodie over the course of the charged conspiracy, as well as Mr. Sabzali beginning in early 1996. Mr. Sabzali and Don Brodie shared a secretary in the Bala Cynwyd office, at least through early 1998, and the Defendant's secretary, at least through early 1998, had her desk physically located directly outside of Mr. Sabzali's office.

On cross-examination, Mr. Grossman testified that during the relevant time period (1993 to 2000), the Defendant spent a "significant amount of time" (estimated at 70 to 80 %) away from the Bala Cynwyd office establishing new manufacturing plants and sales offices in China and Romania.

2.      The billing instruction, audit and related events

During 1992, from his office in Canada, Mr. Sabzali sold Purolite product through the Canadian subsidiary ("Purolite Canada") in four transactions to Galax, Incorporated ("Galax"). The product was booked and invoiced from the Bala Cynwyd office, but manufactured by and shipped from the U.K. entity. In 1986, the United States Department of Treasury had designated Galax a "specially designated national," i.e., a company with which American companies were prohibited from transacting business because the

23

designated company was known to have ties with Cuba.[16]  While these 1992 transactions with Galax were not charged in the indictment, they are important background to much of the evidence presented against the Defendant because trial testimony established that, in early 1993, the auditing firm of Deloitte & Touche LLP conducted an audit of The Bro-Tech Corporation for the year 1992 and found reference to one of the 1992 sales to Galax.  The auditor-in-charge, Mr. Stephen Coulter, CPA, brought the reference directly to the Defendant's attention, and this touched off a series of events, evidence of which forms the basis for the linchpin inference urged by the government in this prosecution – i.e., that the Defendant *knew* his company was conducting illegal sales transactions with Cuba and knew that the U.S. entity was involved, or was at least willfully blind to that involvement.  That the 1992 transaction with Galax had occurred and how the auditor's concern about it was handled by the Defendant are critical.  While the trial testimony concerning this series of events was often confusing and sometimes contradictory, we attempt to set it forth as coherently as possible and in the light most favorable to the government.

We begin with the evidence related to what we will call "the billing instruction."  Mr. Grossman (former CFO of The Bro-Tech Corporation) testified on direct examination that he was personally aware of a sales transaction made to Galax in 1992.  He explained how he came to possess that knowledge:

---

[16]A senior enforcement investigations officer of OFAC, testifying for the government, explained the term SDN, that Galax was an SDN, and that it had been so designated in 1986.  *See* 31 C.F.R. § 500.306 (defining "specially designated national"); *see also* 31 C.F.R. Ch. V, App. A (2005) (listing Galax, Inc. as an SDN).

24

Q: And how do you know that – or how were you aware of it? ...

A: Yes. During the year, in 1992 at some point, [the Defendant] called me into his office and indicated that there had been an invoice, this Galax, and that it had a reference to Cuba on there and that I should instruct the customer service department, the billing department, to make certain that they don't include any reference to Cuba in any future invoices on the face of the invoice.

Q: Was that in 1992?

A: I believe so.

Q: Did you give such an instruction to the billing department?

A: Yes, I did.

A. 716 (Grossman, direct).

Next is the evidence related to the audit. Deloitte & Touche had been performing audits for The Bro-Tech Corporation since approximately 1988, and for the year 1992, had been engaged to express an opinion on the combined financial statements of The Bro-Tech Corporation and Bro-Tech Limited. In the course of performing the 1992 audit early in 1993, the auditors "found a shipment into Cuba on a sales transaction .... [in a] dollar amount ... between 2 and $300,000..." A. 304 (Coulter, direct). The occurrence of this transaction was significant to the auditors because, as Mr. Coulter

25

explained, "[w]e are aware that U.S. companies were not supposed to be shipping goods into Cuba because of the American boycott," and "to the extent a transaction is a potential illegal act, the auditor is obligated to follow up on that transaction to determine the potential consequences both from a financial reporting as well as a disclosure point of view." A. 304-05 (Coulter, direct). The auditors were concerned that The Bro-Tech Corporation would be subject to a monetary fine for the Galax transaction, which, depending on the likelihood of assessment, would have to be addressed in the audit in a particular fashion. In light of this concern, Mr. Coulter spoke directly to the Defendant, as President of The Bro-Tech Corporation, about the Galax transaction and its implications for the audit. Mr. Coulter testified as to that conversation:

> Q: Was that [conversation with the Defendant] on the telephone or face to face or in what way?
>
> A: Well, there were numerous discussions regarding the liability. Some were by telephone, some were face to face and we did have discussions, in addition to [the Defendant] had discussions with Ed Grossman.
>
> ...
>
> Q: And when you talked to [the Defendant], what was his explanation regarding this transaction?
>
> A: [The Defendant] indicated that the transaction had been effected by a new salesman with the

26

company and that it was one transaction and he understood that they should not be doing this, and he was going to take steps to insure that the company would detect any such proposed transactions in the future.

A. 307 (Coulter, direct).  Other testimony supported that the Galax sale under discussion had been arranged by Mr. Sabzali operating from Canada, and that he had been a salesman for the company since approximately 1990 – i.e., two to three years before the outlined conversation.  Two "steps" were taken in the wake of the conversation between the Defendant and Mr. Coulter concerning the Galax transaction.  We present these "steps" first as filtered through the eyes of the auditors and then as they were "implemented" by The Bro-Tech Corporation.

Subsequent to the conversation outlined above, the Defendant showed Mr. Coulter a copy of the following memorandum written on Purolite letterhead:

April 7, 1993

To:     All Sales Offices

From:  Steve Brodie

CC:     Don Brodie/Ed Grossman

It has come to our attention, during the 1992 audit, that a sale was made to the Canadian Company, Galax.  The Galax credit was checked in our Philadelphia office, and approved.  Subsequent to the

27

approval of the order, our shipping department in the UK was ordered to drop-ship this order to Cuba.

While it is proper to ship this order from the UK in terms of UK law, it is contrary to USA policy and law to ship material of any kind to the island nation of Cuba in violation of the US embargo. Brotech Corporation is a US Corporate citizen, and as such, has no intention of violating US policy, now nor in the future.

No shipment of Purolite merchandise is to be shipped to, redirected to, or trans-shipped to Cuba. Any requests to do so are to be reported to Don or me.

/s/ Steve Brodie

A. 206 (Gov. Ex. 11) (hereinafter the "future policy memorandum") (emphasis added). In addition to being the purported issuer of the future policy memorandum, the Defendant had also signed it. Mr. Coulter, however, did not find the memorandum helpful for deciding how to characterize the Galax transaction for auditing purposes, and his reaction to the memorandum set off another important response from the Defendant. As Mr. Coulter explained:

> Q: When you saw this document, were you satisfied it took care of the problem?
>
> A: No, we were not.
>
> Q: And why not?

A:	Well, essentially that was certainly appropriate going forward to insure that there were no shipments to Cuba and we fully supported that, however, the fact of the matter was that there was a shipment in 1992 to Cuba and we did not know the legal ramifications of that. And we were requesting from the company a legal opinion with respect to their exposure.

Q:	And what was [the Defendant's] reaction when you told him you wanted a legal opinion?

A:	Well, again, because it was a single transaction performed by a salesman that was new to the company, [the Defendant] felt like we were overreacting in requesting a legal opinion and he did not want to incur the cost of a legal opinion.

A. 314-15 (Coulter, direct)  The legal opinion requested by Mr Coulter was subsequently obtained, and Mr. Coulter participated in a telephone discussion of that opinion with the attorney involved. Mr. Coulter testified that the legal opinion, "together with management's representation that the transaction was unintentional and inadvertent," were relied upon by the auditors in determining that the possibility of a fine related to the transaction was "remote."  A. 315 (Coulter, direct). The "remote" characterization was significant to the auditors because, as Mr. Coulter explained, "'remote' mean[t that] it's less likely that a liability [here, a fine] has been incurred, and in that instance there would be no requirement to either disclose or record the liability" in the audit.  A. 306-07 (Coulter, direct).  When the 1992 audit report for The Bro-Tech Corporation was subsequently

29

issued in July 1993, Deloitte & Touche also sent a letter addressed to the "directors of Bro-Tech Corporation trading as the Purolite Company to the attention of [the Defendant], President," in which the auditors characterized the legal opinion as they had understood and relied upon it in issuing the 1992 audit:

> The company inadvertently entered into a sales transaction with a new customer that is listed by the U.S. Department of Treasury as a specially designated national (SDN). Sales to SDN's are prohibited by law and carry potential civil penalties which, depending on intent, could be significant. The company's legal counsel has indicated based on very limited knowledge of the transaction and the related federal laws that since the sale was unintentional, the likelihood of fines and penalties being assessed is remote in this particular case.

A. 319 (Coulter, direct) (reading Gov. Ex. 4). Mr. Grossman testified that he had received a copy of this letter most likely through the Defendant's secretary.

Prior to the issuance of the 1992 audit report in July 1993, another "step" was taken in the wake of the auditors' concern with the Galax transaction. When asked if the Defendant had made any other suggestions regarding what might be done with the Galax transaction in terms of accounting, Mr. Coulter testified:

> A: At one point in the process of dealing with this issue, there was a suggestion that the sale recorded in Bro-Tech Corporation's books be transferred to Bro-Tech, Limited's [i.e., the U.K. entity's] books.

30

Q:    And what was your response to that?

A:    After considering it, we felt like we would
      still need a legal opinion because the sales
      transaction was initially recorded in Bro-Tech
      Corporation's books to begin with, and that
      even if it were transferred to Bro-Tech,
      Limited, we would not know the legal
      implications of that either.

Q:    Did that go any further, that suggestion?

A:    I don't believe it did, no.

A. 320 (Coulter, direct).[17]   On cross-examination, Mr. Coulter
explained that, in addition to recommending that a legal opinion be
obtained with respect to treatment of the Galax transaction for audit
purposes, Deloitte & Touche recommended that a set of checks be
instituted by the company to make certain that SDNs would not
become clients in the future.   Someone from The Bro-Tech
Corporation – although their identity is not clear – told Mr. Coulter
that such checks would be implemented.[18]   A few months after the

---

[17]*But see infra*. at 32-34, reviewing Grossman's testimony
about transferring the sale to the U.K. entity's books.

[18]Also on cross-examination, Mr. Coulter explained that he
had participated in a telephone conversation during this same time
period related to the Galax transaction with someone at Coopers and
Lybrand, which was then performing audits for Bro-Tech Limited in
the United Kingdom.  The impetus for the conversation was Deloitte
& Touche's engagement to express a combined audit for The Bro-
Tech Corporation and Bro-Tech Limited for 1992, and Deloitte &

1992 audit report was issued in July 1993, someone from The Bro-Tech Corporation – again their identity is unclear – informed Deloitte & Touche that it was being replaced by Coopers and Lybrand.[19] Mr. Coulter acknowledged on cross-examination that Coopers and Lybrand had already been performing audits for Bro-Tech Limited. He also acknowledged that the Defendant had been upset with the perceived untimeliness and expense of the 1992 audit report.

Mr. Grossman provided the view from inside The Bro-Tech Corporation concerning how the "steps" identified by Mr. Coulter were actually implemented by the company in the wake of the auditors' concern with the Galax transaction. He testified that indeed a transfer of a Galax transaction to the books of Bro-Tech Limited did occur, but his testimony was confusing as to whether that transfer involved the 1992 Galax transaction found by Deloitte & Touche or another Galax transaction in 1993. He testified:

> Q: ... [Y]ou were aware of – you testified you were aware of a Galax sale in '92, but you're not sure if it's the same one that the auditors found?
>
> A: Correct.

Touche's concern that there may be additional shipments to Cuba relevant to the combined audit.

[19]This fact was important to the government, which urged an inference that the switch in auditors was undertaken to punish Deloitte & Touche for finding and focusing on the problematic Galax transaction and/or to ensure that The Bro-Tech Corporation was not being serviced by auditors already aware of and therefore more prone to scrutinize the company's transactions for Cuban ties.

Q:      What if any sales were you aware of to Galax
        in 1993?

A:      I'm not aware of any sales certainly that were
        processed through the United States office.
        Again, I believe – I'm sorry, I think that there
        was a transaction in 1993 that had initially
        been billed by the U.S. office and when this
        was found a decision was made to in essence
        transfer the sale to – so that it would come
        through Purolite International Limited, monies
        that were collected in connection with this
        sale were collected by the U.S. company and
        transferred to Purolite International Limited.

Q:      Can you take a look, sir, at Government
        Exhibit 10? Do you recognize that document?

A:      Yes, I do.

Q:      Is there a notation concerning something that
        you asked to be done?

A:      It's dated March 31st, 1993.  'Per Ed. G.,'
        which would be myself –

        ...

Q:      [ ]  Do you want to tell us what this is all
        about?

A:      Again, this is a handwritten note dated 3/31/93
        and it says "Per Ed. G.," which is myself,

33

"$330,103.20 sale to be reversed, cash to be reversed and forwarded to Purolite International Limited," it says, "conversation" or "conversion to be Bala's responsibility."

Q:     Well, did you make – who if anyone made that decision with you?

A:     This decision would have been made in conjunction with [the Defendant], it probably would have been a conversation that we had once we understood that there was, you know, a transaction related to Cuba and that there would be funds coming into Purolite Company as a result of that transaction.

Q:     Is this at the time of the audit?

A:     Yes. March 31st, '93, so the audit would have taken place – either been completed shortly before that or some time around that time frame.

A. 720-722 (Grossman, direct).

Mr. Grossman also testified regarding the future policy memorandum, a critical piece of evidence for both the prosecution and the defense. Handwritten on the copy of the future policy memorandum admitted at trial was a faxed notation, indicating that the memorandum had been faxed as addressed on April 7, 1993, to all sales offices, as well as to, *inter alia*, Don Brodie and Mr. Grossman. Mr. Grossman testified that he received a copy; another salesman testified that he did not. In addition to the memorandum itself

34

constituting evidence, Mr. Grossman testified that it was his understanding that the memorandum encapsulated The Bro-Tech Corporation's policy regarding sales to Cuba in the future. On direct examination, he testified:

> Q: What if any decisions were made by [the Defendant] in response to the Deloitte & Touche audit?
>
> A: My understanding is that any – any orders having to do with Cuba would be processed through the U.K. company. My understanding at that time was that they did not have the same restrictions on shipping to Cuba and this if there, you know, was business having to do with that it would – material would not only be shipped from Purolite Limited, but it would be, you know, billed by Purolite International Limited[].

A. 719 (Grossman, direct). Mr. Grossman provided further critical testimony regarding the future policy memorandum on cross-examination, which we set forth in full:

> Q: As a result of [ ] those events [i.e., the audit events just discussed, having occurred in early 1993], you indicated that [the Defendant] issued the memorandum that you looked at dated April 7, 1993 [i.e., the future policy memorandum], correct?
>
> A: Correct.

35

Q:     And as a result of those events the policy of Purolite in the U.S. going forward was that if future materials were to be shipped to Cuba they would be shipped from Purolite International in the United Kingdom and billed by Purolite International in the United Kingdom, correct?

A:     That was my understanding, yes.

Q:     And that was different from what had happened in 1992, because in 1992 all of the product had been manufactured and shipped from the United Kingdom, [but] it was billed out of the United States entity, correct?

A:     It was billed out of the United States entity. I can't say without a doubt that a hundred percent of the material came from Purolite International Limited, I don't know where all of the material came to fill those orders, I know that some ...

Q:     Your understanding at the time was that it had come from Purolite International, correct?

A:     At least primarily, yeah.

Q:     Now, you understood at that time that it was lawful to ship product to Cuba from the United Kingdom, did you not?

36

A:      I understood, it was explained to me at some point in time that they did not have the same prohibition in the United Kingdom as we have in the United States.

Q:      And [the Defendant] told you in 1993 that he understood that it was lawful for entities in the United Kingdom to ship product to Cuba, correct?

A:      Yes.

Q:      Now, in light of that decision [i.e., in April 1993], your understanding of what both Bro-Tech's finance department and Bro-Tech in the United States should be doing generally was that there should not be any future transactions involving Bro-Tech in the U.S. that involved the sale of product to Cuba, correct?

A:      Correct.

Q:      And [the Defendant] told you as part of that decision [i.e., in 1993] that future invoices coming out of Bro-Tech should not reflect sales to Cuba, correct?

A:      Correct.

Q:      And that was because future sales were supposed to go out of Purolite International in the United Kingdom, correct?

37

A: This is after – you're talking about after the Deloitte & Touche –

Q: After the Deloitte & Touche audit.

A: Correct.

Q: So your mission, as you understood it going forward from 1993, was to ensure that your finance department was not causing transactions to be booked out of the United States that involved sale of product to Cuba?

A: My understanding was that was not supposed to happen. It was [the Defendant's] and Don Brodie's company, so it wasn't my decision as to – you know, to accept orders and to conduct commerce with Cuba, so my understanding is that that wasn't going to happen and that any commerce with Cuba would be transacted through Purolite International, Limited.

Q: ... You didn't receive any instruction at that time to delete or alter or destroy any records that related to Cuba in 1993, did you?

A: That's correct.

Q: And you didn't give any such instructions to anyone within the finance department, correct?

A: That's correct.

38

Q:      So for the 1992 transactions that had happened with Galax, the documents that related to those remained within the finance department of Bro-Tech, correct?

A:      That's correct [presumably, this suggests that, although the 1992 Galax sale had been transferred to Purolite International's books, Bro-Tech in the United States still had records relating to that sale and the fact that it had been transferred].

        ...

Q:      Now, is it fair to say that in addition to the principle that sales would now be booked out of the U.K., you were taking efforts to ensure that if anyone affiliated with Bro-Tech traveled to Cuba that the expenses associated with that travel would be borne by the United Kingdom entity?

A:      Yes.

Q:      And that was because based on your understanding the United States entity was not to be involved in activity with respect to Cuba?

A:      That's correct.

A. 747-49, 752 (Grossman, cross-examination).

39

3. The "Our friends in the Caribbean" speech

Craig Gentile, a regional salesman for The Bro-Tech Corporation from 1990 to 1997, testified that the company held bi-annual sales meetings in the spring and fall. Asked whether Cuba or sales to Cuba were ever mentioned at those meetings, he testified:

A: There was only one time that Cuba was ever mentioned in a sales meeting. ... It was either fall of '91 or spring of '92. And we met at the manufacturing facility in Philadelphia, downstairs, and everybody gave their presentation on their sales and what they were going to do, projections for the next year or how they had done previously. And Jim Sabzali got up to give his presentation and during his presentation he said that this was the business that they were going to be doing in Cuba and ...

Q: What happened then?

A: [The Defendant] jumped up, he was very excited – I don't remember exactly what he said, but [Mr. Sabzali] just smiled and said, ['] well I mean our friends in the Caribbean.[']

...

Q: What was your reaction to what happened?

A: I was surprised that [Mr. Sabzali] brought it up.

40

Q:      What was the reaction of any other salespeople in the room?

A:      I think everybody was surprised, it got very quiet. Then we proceeded.

A. 362-363 (Gentile, direct).

Mr. Gentile was questioned on cross-examination as to the date of this incident. He had previously told the grand jury that the event occurred in 1993 and on cross-examination at trial he acknowledged this previous testimony. A. 371 (Gentile, cross-examination) ("[Gentile]: I don't have the transcript, but if that's what it says, that's what I said."). However, as set forth above, his trial testimony placed the incident earlier in time, and before the events of the 1992 audit report.

4.      Mr. Sabzali's 1995 performance review

Mr. Sabzali, who had arranged the transactions with Galax in 1992 from his Canadian office and who had spoken of Cuban sales during the sales presentation witnessed by Mr. Gentile, was promoted in 1995 to the position of Director of Marketing for the North American operations of The Bro-Tech Corporation, and reassigned as a result from Canada to the Bala Cynwyd office. The basis for the promotion was summed up in a type-written performance review dated May 16, 1995. Critically, the performance review took note of Mr. Sabzali's development of the "Caribbean territory to make Purolite the dominant player" and his procurement of "sales in Mexico as an adjunct to the Caribbean." A. 207 (Gov. Ex. 14).[20]

_____

[20]As explained *infra*., "Caribbean" was generally understood and used by many Bro-Tech/Purolite employees to refer to Cuba. On

Handwritten at the bottom of the performance review was the notation: "New Position, Salary $102,000, Effective 4/1/94." A related memorandum identified Mr. Sabzali's responsibilities in the new position; importantly, however, he was to "continue handling the Caribbean areas for North America." Mr. Grossman testified that the handwritten notation at the bottom of the performance review "looks like the handwriting of – or the printing of [the Defendant]," A. 731 (Grossman, direct),[21] and another former employee, Daniel Opperman, testified that while it was Don Brodie who had hired Mr. Opperman, it was the Defendant who had promoted him.

5.      Pervasive use of "code words" for Cuba

A number of former employees of The Bro-Tech Corporation testified that they understood, at the time of their employment during the relevant time period, that terms like "the Caribbean," "the island" and "that island" were used to refer to Cuba. Specifically, Mr. Grossman testified that "Caribbean island was kind of a code word for Cuba after Deloitte and Touche's findings in early 1993," A. 725 (Grossman, direct), and that "Caribbean meant Cuba." *Id*. at 728.

direct examination, Mr. Grossman testified that he could recall only one other customer in the Caribbean, and that he too understood Caribbean to mean Cuba.

[21]As the District Court pointed out, 268 F. Supp. 2d at 416 n.3, there were problems with Mr. Grossman's testimony in that he did not specifically clarify that he had ever seen the Defendant's handwriting, and the defense was apparently caught off-guard by the government's elicitation of this lay opinion testimony on handwriting during the trial. However, because no objection to this testimony was made at trial, we, like the District Court, will consider it legitimate evidence for the jury to consider.

Mr. Sabzali's secretary in the Bala Cynwyd office from 1996 to early 1998 testified that she recalled two conversations with Mr. Sabzali regarding Cuba, one of which she described as a "sort of smiling conversation where he said, we refer to it as the island, not by its formal name." A. 1302 (Lenton, direct). Ms. Graves, a former customer services employee in charge of processing sales orders for The Purolite Company at the Bala Cynwyd office from approximately 1995 until her retirement in January 1999, testified that she and her counterpart in the Canada office would frequently talk about shipments to Cuba, but specified that in so doing, "[w]e didn't refer to them as shipments to Cuba, but ... as shipments to that island." A. 880 (Graves, direct). Mr. Nace testified that he had told Mr. Sabzali that he was uncomfortable receiving faxes from Sabzali openly referring to Cuba and as a result, Mr. Sabzali referred to Cuba, at least in dealings with Mr. Nace, as the Caribbean. Mr. Carlos Lugo, who operated as a salesman of The Purolite Company in Mexico from May 1996 to 2000,[22] testified with reference to an expense report that he had turned in to the Bala Cywyd office related to travel through January 1998 that "Mr. Ed Grossman called me and said to me that that report had to be redone because I stated that I was going to Havana and the name Havana could not be in the report." A. 601 (Lugo, direct). There was also testimony that words like Havana and

_____

[22]Mr. Lugo testified that in September 1995, he was contacted by someone he characterized as the international manager of the Purolite Company based in Bala Cynwyd, and asked to help incorporate an arm of the Purolite Company in Mexico. In 1996, Mr. Lugo "started as an employee of the Mexican entity" which was owned "when it was created ... 50 percent by Mr. Don Brodie and 50 percent by [the Defendant]." A. 580 (Lugo, direct). Later, according to Mr. Lugo, "98 percent of the shares were transferred to The Bro-Tech Corporation." *Id.*

Cuba were sometimes used rather openly in transaction and expense-related documentation.

6.      Post-investigation events

On February 5, 1997, and pursuant to an earlier telephone conversation, Customs agents visited the Bala Cynwyd office and met with Mr. Dolan.  At that meeting, an agent "apprised Mr. Dolan that we [Customs] had an investigation and it appeared, based on records that I had in my possession and confidential source information, that there were violations of illegal exports relative to the OFAC regulations."  A. 1447 (McCrosson, direct).  According to the agent, Mr. Dolan responded that he had "researched [the company's] files based on the previous phone call and said he could only locate one document relative to the names I had provided him."  *Id.*  Mr. Dolan then showed the agents a copy of the future policy memorandum, which purported to state as a matter of company policy that the U. S. entity was not to be involved in any sales to Cuba.  With this background, we present the evidence related to the post-investigation events.

a.      The Sabzali memoranda

The government introduced three memoranda written by Mr. Sabzali in the weeks following the Customs agents' visit.  The first, dated February 28, 1997, and addressed to Pilar Guzman, a woman through whom Purolite product was sold to Cuban end-users, provided in pertinent part:  "Please note that pricing to San Marco will change slightly for the four orders being ready, as well as for future orders. *The reason is that we now have to ship products from U.K.*, and the easiest method would be to ship directly to Havana, and not to Tampico."  A. 1310-11 (Lenton, direct, reading from Gov. Ex. 77) (emphasis added).  The first memorandum did not identify the

44

Defendant as someone intended to receive a copy – he was not, in other words, "carbon copied" on the first memorandum. The second memorandum, also dated February 28, 1997, was addressed to an Italian representative of The Purolite Company, and provided, in pertinent part: "For future reference, please note that orders will be sent from Milan to Pontyclun, *but invoicing will be done directly from Ponty to the customer in the Caribbean.*" A. 1313 (Lenton, direct, reading from Gov. Ex. 78) (emphasis added). The subject line on the second memorandum referenced "four orders for the Caribbean." *Id.* The Defendant was carbon copied on this second memorandum, and the secretary who faxed it testified that he would have received his copy in the Bala Cynwyd office. The third memorandum, dated March 3, 1997, and carbon copied to the Defendant, provided further details regarding the "Caribbean orders," confirmed that the sales would be handled entirely through Purolite International Limited, and openly listed the place of shipment as Havana, Cuba.

      b.      Telephone calls

The government offered testimony related to two telephone calls made by the Defendant after the investigation which lead to the indictment was underway. In September 1999, months after she had retired from The Purolite Company, Ms. Graves, the former sales processing clerk, received a telephone call from the Defendant at her home. She testified:

A:      He asked me if I had been contacted by anyone from the Government regarding the Cuba sales.

Q:      And what did you say?

45

A: I said yes, I had, and then he – I mentioned that I had been questioned about, I believe it was the shipments for Galax, and I mentioned that there were other shipments after those, and I said but I can't remember the name of the company.

Q: Shipments where?

A: To Cuba. And he said ['] well, if you can't remember the name, then you don't have anything to tell them.[']

A. 881 (Graves, direct). As noted above, the Defendant agreed during oral argument on the motion for acquittal that other evidence in the government's case would support a finding that "from 1994 to 1996, thirty-five sales were made by Bro-Tech through intermediaries in Canada and Mexico." *See supra*. at 20-21. The intermediary in Mexico was an entity known as Ingenieria y Mantenimiento Industrial (or "IMI") and shipments to IMI occurred after the Galax sales. Ms. Graves testified that, as a former sales processing clerk, she knew of the sales through IMI. On cross-examination, Ms. Graves acknowledged that the Defendant had expressed "interest and curiosity" about the subject matter of the government investigation during their telephone conversation, and that she knew at the time she was interviewed by the government that the company had legal counsel whom she did not advise of the interview. Additionally, she testified that she had reported the telephone call to the government and agreed to have a wire installed on her phone to record any future calls from the Defendant, but he never called again.

The second telephone call identified by the government was purportedly made by the Defendant to Mr. Lugo, the Purolite

46

salesman in Mexico. Mr. Lugo testified that he had met someone at the United States Embassy in Mexico City at the request of the United States government sometime after December 1997 or 1998.[23] There, he was asked "some questions regarding why I went to Cuba. ... if I go to Cuba for business or anything." A. 607 (Lugo, direct). Subsequent to that meeting, Mr. Lugo reported on it at Mr. Sabzali's request to Mr. Dolan. Mr. Lugo testified that he then received a telephone call from the Defendant:

> Q: What if any conversations did you have with [the Defendant] about your embassy visit?
>
> A: After my visit, [the Defendant] called me and said to me not to do it again with[out] inform – informing before.
>
> Q: Not to do what again?
>
> A: To go to the [United States] embassy.

A. 612 (Lugo, direct). On cross-examination, Mr. Lugo acknowledged that he knew at the time of his interview at the United States Embassy that the company was represented by counsel and under investigation for trading with Cuba. He also acknowledged that he had previously testified before the grand jury that the embassy visit occurred sometime in April or May 1999, and that it was Mr. Sabzali, not the Defendant, who informed him following that visit

_____

[23]It is unclear from the record, and apparently unclear to Mr. Lugo himself, exactly why he was contacted by the United States and asked to visit the Embassy in Mexico City. He had, however, previously had two boxes of Cuban cigars confiscated from him by the United States Customs Service in Washington, D.C.

47

that the Defendant did not want him to go to the embassy again without informing the company.

## B.      The Intent Requirement

On appeal, the Defendant argues in support of a separate ground for affirming the judgment of acquittal – specifically, that the government was required and failed to show that the Defendant had knowledge of the specific CACR or licensing provision which he and his co-conspirators were found to have violated. This argument relies on an inaccurate statement of the law, which we find necessary to correct in order to guide the District Court on remand should there be a new trial.

The Defendant was indicted for conspiracy to violate Section 16 of the TWEA and CACR § 515.201(b), and accordingly the government, in proving a conspiracy under 18 U.S.C. § 371, was required to prove at least the degree of criminal intent necessary for the underlying substantive offense of violating the American Cuban embargo. *See United States v. Feola*, 420 U.S. 671, 686 (1975). To prove conspiracy to violate the TWEA and the CACRs, the government is required to show "specific intent." *See Fuentes-Coba*, 738 F.2d at 1196 (prosecution for violating the American Cuban embargo); *United States v. Macko*, 994 F.2d 1526 (11th Cir. 1993) (same); *see also United States v. Tooker*, 957 F.2d 1209 (5th Cir.) (prosecution for violating American embargo on trading with Vietnam), *cert. denied*, 506 U.S. 864 (1992); *United States v. Dien Duc Huynh*, 246 F.3d 734 (5th Cir. 2001) (same).

In the context of the TWEA, the specific intent requirement demands that the government prove that a defendant had general knowledge of the law which forbade his actions and acted with the specific intent to circumvent that law. *See Tooker*, 957 F.2d at 1214.

48

But the government need not prove the defendant had knowledge of the *specific regulation* governing the conduct engaged in – in other words, a defendant "cannot 'avoid prosecution by claiming that [he or she] had not brushed up on the law.'" *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 123 (1974)). *See also Bryan v. United States*, 524 U.S. 184 (1998) (conviction for "willfully" violating federal statute prohibiting sale of firearm without license requires a showing that the defendant knew his conduct was unlawful, not that he was aware of the particular licensing requirement); *id.* at 196 ("Thus, the willfulness requirement of § 924(a)(1)(D) does not carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required"); *Liparota v. United States*, 471 U.S. 419, 434 (1985) (explaining in the context of prosecution for acquiring possession of food stamps in a manner unauthorized by statute or regulations that the government need not show "knowledge of specific regulations governing food stamp acquisition or possession."); *United States v. Tsai*, 954 F.2d 155, 162 (3d Cir.) (stating in context of conviction for violating Arms Export Control Act, "[i]f the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was."), *cert. denied*, 506 U.S. 830 (1992). "Rather, the government must prove only that the defendant[] knew that [his] planned conduct was legally prohibited and that [he] therefore acted with an 'evil-meaning mind.'" *Tooker*, 957 F.2d at 1214 (quoting *Morissette v. United States*, 342 U.S. 246, 251 (1952)). A jury may infer a willful violation of a known legal obligation from the facts and circumstances surrounding the case. *See Tooker*, 957 F.2d at 1214 (citing *Liparota*); *Macko*, 994 F.2d at 1535 (concluding "the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that [the defendants] knew about the Cuban trade embargo and deliberately violated it through their own conduct or by aiding and abetting other individuals."); *Dien Duc Huynh*, 246 F.3d 743 (same in context of the Vietnam embargo); *see*

49

*also United States v. Covarrubias*, 94 F.3d 172, 175-76 (5th Cir. 1996) (finding, in context of prosecution for exporting weapons into Mexico, sufficient evidence to support jury's conclusion that defendant knew that either a license or some other form of authorization was required to lawfully transport weapons).

Of course, in this criminal conspiracy case, like any other, the government must prove that the defendant had knowledge of the facts that constitute the offense and of the illicit purpose of the conspiracy. *See, e.g.*, *United States v. Idowu*, 157 F.3d 265, 267 (3d Cir. 1998) (explaining, in the context of a challenge to the sufficiency of the evidence for a conspiracy conviction, that "the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy"); *United States v. Pearlstein*, 576 F.2d 531, 540-41 (3d Cir. 1978) (stating, in the context of reversing conviction for mail fraud, that "the evidence must indicate that the defendants had knowledge of the fraudulent nature of the [ ] operation and wilfully participated in the scheme with the intent that its illicit objectives be achieved"); *see also Bryan*, 524 U.S. at 193 ("'knowingly' merely requires proof of knowledge of the facts that constitute the offense"). The knowledge element of a crime such as the one charged here may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or "deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999). To find knowledge premised on the latter "willful blindness" theory, the jury must be able to conclude that "the defendant himself was objectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985). Willful blindness is not to be equated with negligence or lack of due care, and does not allow a conviction simply because the defendant "should

50

have known of facts of which he or she was unaware." *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000) (willful blindness is a "subjective state of mind that is deemed to satisfy the scienter requirement of knowledge"); *see also United States v. Sharma*, 190 F.3d 220, 231 (3d Cir. 1999) (purpose of a willful blindness instruction is to "ensure[] that a juror who believed that a defendant turned a blind eye towards his co-defendant's conduct would not vote to acquit the willfully blind defendant"). As noted, the government pursued the willful blindness theory of knowledge at trial and the District Court provided a correct willful blindness instruction to the jury.

The indictment and the evidence presented by the government in this case naturally tended to divide the overt acts in furtherance of the conspiracy into two time frames: (1) 1994 (when the first overt act was alleged to have occurred) through late 1996, and (2) early 1997 (when Customs agents first visited the Bala Cynwyd office) to May 2000 (the end of the alleged conspiracy).[24] We understand the defense to have incorporated these two time frames into its argument as to why the government failed to prove that the Defendant acted with the requisite intent. He argues on appeal that the evidence "is consistent with the fact that [he] did not know that any transactions with Cuba were being carried out unlawfully through the United States. Rather, he believed that all transactions with Cuba were being

---

[24]Indeed as the Defendant states in his brief on appeal, "[t]he government introduced evidence that, from 1994-1996, [The] Bro-Tech [Corporation] engaged in transactions that ultimately involved Cuba. From 1997-1999, however, [The] Bro-Tech [Corporation] did not engage in sales to Cuba. Rather, sales to Cuba in 1997-1999 were handled by PIL [Purolite International Limited] in the United Kingdom, without United States involvement." Brief of Appellee at 10.

handled lawfully by entities in Canada and the United Kingdom without United States involvement." Brief of Appellee at 11. In other words, the Defendant contends that he believed at all times pertinent to the charged conspiracy that trading with Cuba was lawful so long as conducted through the U.K. entity without the participation of the U.S. entity. To the extent that the evidence showed the U.S. entity was actually involved in the transactions from 1994 through 1996 (which, as noted above, the Defendant agreed the evidence could prove), then Defendant posits that he did not know of that involvement, and hence could not have willfully violated the law. As for the transactions which occurred from early 1997 through the end of the charged conspiracy, the Defendant posits that he did not know that trading with Cuba through a foreign subsidiary owned or controlled by a American citizen was illegal, and hence could not have acted with intent to violate the law.

Implicit in this defense strategy (and indeed obvious from the face of the future policy memorandum that the Defendant purportedly wrote and relies heavily upon for his defense) is an admission that the Defendant understood that the U.S. entity was prohibited from trading with Cuba, and indeed, that was a correct interpretation of the law. To the extent that the Defendant also believed it was lawful for the U.K. entity to trade with Cuba so long as the U.S. entity was not involved, his interpretation of the law was incorrect, because as written, the CACRs prohibit entities which are "owned or controlled" by American citizens from trading with Cuba. *See* 31 C.F.R. §§ 515.201(b), 515.329 (a), (c).[25] We do not find it necessary,

_____

[25]The Defendant informs us in a footnote in his brief on appeal that "evidence in the defense case demonstrated that [the Defendant] tolerated these transactions only because he believed – based on information from the British government and Bro-Tech's outside counsel, Morgan Lewis [& Bockius LLP] – that it would be illegal in

however, to determine whether the Defendant's mistaken understanding of the law as it related to trade conducted solely through the U.K. entity in the latter time period should negate a finding of specific intent and thereby support acquittal because, for reasons that will become clearer as we examine the reasonable inferences that arise from the government's evidence below, we conclude that a reasonable jury could find that the Defendant actually knew of, or was willfully blind to, the involvement of the U.S. entity in the transactions conducted in 1994-1996.[26]  Such a conclusion would by itself support a conviction for conspiracy, as it is not necessary for the government to prove anything related to the latter

Canada and in the United Kingdom to halt all such transactions in deference to the United States embargo."  Brief of Appellee at 12.  As explained above, we do not review any evidence in the defense case in assessing the propriety of the judgment of acquittal.  However, we take note of this footnote and of the fact (revealed to us by the government) that the Brodies and The Bro-Tech Corporation have pending a legal malpractice action against Morgan, Lewis & Bockius LLP, to stress that we appreciate the broad context of this case, but do not deem it relevant to the present decision.

[26]The District Court also recognized that the evidence "establishe[d] that [the Defendant] did know that it was illegal for the U.S. company to be involved in sales to Cuba."  268 F. Supp. 2d at 417.  The District Court further reasoned that "[i]f there were evidence ... that [the Defendant] knew about the involvement of the U.S. company in some of the sales from 1994 through 1996, the Court will assume that a rational jury could find that he knowingly and willfully joined the conspiracy."  *Id.* at 417.  The District Court found insufficient evidence to support the inference of such knowledge; examining the same evidence, however, we find it sufficient to support that critical inference.

53

time period.  However, we also conclude that a reasonable juror could conclude on the evidence that the Defendant knew or was willfully blind to the fact that the U.S. entity was still involved (albeit to a much lesser degree) in the transactions that occurred in the latter time frame.[27]  We now explore how these conclusions may be reached on the evidence as a whole.

### C.      The Evidence as a Whole

We will by necessity segregate our discussion in terms of the six key pieces of evidence identified above, but one should not miss the forest for the trees.  The inferences against the Defendant urged by the government depend for their reasonableness on viewing the evidence as a whole, and while the Defendant disputes the existence of nearly every tree, we conclude that a reasonable jury could find beyond a reasonable doubt that the Defendant did conspire to violate the American Cuban embargo.

### 1.      Basic company structure

We begin with the evidence related to the basic structure of The Bro-Tech Corporation d/b/a/ The Purolite Company, not because it was the most critical, but because a rational jury could legitimately use it as a prism through which to assess all of the other circumstantial evidence presented against the Defendant in this case.

---

[27]Additionally, although the government urges the inference that the Defendant actually knew of the participation of the U.S. entity in the transactions conducted by the U.K. entity and we find that inference reasonable, we believe that a rational jury might also conclude from the evidence as a whole that the Defendant's actions belie a good faith belief in the legality of the "trading though the U.K. is ok" policy which he espoused as the basis for his defense.

We believe, moreover, that this evidence is particularly revealing when considered under the willful blindness instruction given by the District Court.

From the facts related to the basic company structure, the government urged an inference that the Defendant, as President of The Bro-Tech Corporation, knew that the sales involving Cuba were occurring and critically, that they involved the U.S. entity, or was at the very least willfully blind to that fact. The District Court was "very reluctant in a criminal conspiracy case, where the required mental state is knowledge and willfulness, to give any weight to these points," 268 F. Supp. 2d at 420, and moreover, took explicit note of testimony elicited on cross-examination that, during the period of the charged conspiracy, the Defendant "spent 70-80% of his time out of the country opening plants in Romania and China." *Id.* We conclude, however, that the District Court usurped the role of the jury in its handling of this evidence.

In our view, it would be reasonable for a jury to give weight – indeed, substantial weight – to the fact that the Defendant was the President of The Bro-Tech Corporation; this, in turn, would support the critical inference that he knew of the sales to Cuba and of the U.S. entity's involvement therein. This inference is only strengthened when other basic facts pertaining to the corporate structure are added into the mix. While The Bro-Tech Corporation had offices and operations in various parts of the world, it was not a large company as evidenced by the fact that its main office was housed on one floor of a suburban Pennsylvania office building and that the men most intimately involved in the prohibited sales – Don Brodie and later, Mr. Sabzali – had their offices in that building in close proximity to the Defendant's office. The illegal sales to Cuba, moreover, which grossed approximately $2.1 million, were not so minuscule as to reasonably escape the notice of the company's president. Finally, the

55

testimony tended to paint the Defendant as an active participant in company affairs, not as a corporate figurehead whom a jury might more readily infer was ignorant of the actions of his fellow officers and subordinates.

A rational jury, moreover, could legitimately consider the relationship between the Brodies in drawing reasonable inferences about the Defendant's knowledge and intent. While guilt for conspiracy cannot be proven solely by familial relationships, *see e.g.*, *United States v. Williams-Hendricks*, 805 F.2d 496, 502-503 (5th Cir. 1986), it is not the bare fact of kinship that drives the inference sought by the government in this case, but rather the additional facts that the brothers owned the entities involved, were active participants in company affairs, and appear to have communicated with one another on business-related issues, including Mr. Sabzali's promotion. There is no proscription against a jury considering and drawing reasonable adverse inferences from such facts. *See United States v. Warshawsky*, 20 F.3d 204, 209 n.2 (6th Cir. 1994) (noting in context of prosecution for conspiracy to transport stolen parts that "the jury could properly consider the fact that the defendants were both brothers and business partners, which raises a permissible inference that they might share information concerning their business activities"); *United States v. Investment Enterprises, Inc.*, 10 F.3d 263, 267 n.4 (5th Cir. 1993) (noting in context of prosecution of company president for interstate transportation of obscene materials that "[c]lose relationships can be part of the circumstantial evidence from which a jury may infer that the defendant knew of a conspiracy"); *see also United States v. Loscalzo*, 18 F.3d 374, 382 (7th Cir. 1994) (rejecting corporate president's effort to paint his participation in context of conviction for conspiracy to defraud the United States and mail fraud as that of the "ignorant partner" where evidence showed his financial benefit from the problematic arrangement and his overall position of responsibility).

56

As was the case with various testimony elicited on cross-examination of the government's witnesses, the testimony concerning the Defendant's lengthy absences from the Bala Cynwyd office while pursuing business elsewhere may be said to weaken the inference of knowledge or willful blindness to the participation of the U.S. entity, but it does not completely erase that inference or render it unreasonable. Given the fact that this same evidence portrays the Defendant as an active participant in his company's affairs (he was, after all, out of the office actively pursuing business on behalf of his company), a juror might reasonably infer that he was not completely disconnected from events concerning his company, even while physically absent from his office. The weight and relevance of such evidence is to be assessed by the jury; it is not to be deemed of overriding importance by the court.

2.      The billing instruction, audit and related events

The government and the defense each had their own theory as to what the series of events concerning the 1992 Galax transaction and the audit revealed about the state of the Defendant's knowledge of the illegality of the sales to Cuba and of the U.S. entity's involvement therein. The basic thrust of the government's theory was that, as revealed by the billing instruction, the Defendant already knew about the 1992 Galax transaction before it was brought to his attention by the auditors and that his actions related to the billing instruction and the audit in the period of 1992 and 1993 reveal two things: one, that he was attempting to conceal his knowledge of any and all Cuba-related transactions that had already occurred and of the U.S. entity's involvement therein, and two, that he expected and intended future transactions to occur. This global inference is tied to a series of interconnected supporting inferences, each of which we believe a rational jury could make on the evidence presented.

57

The first major supporting inference is tied to the billing instruction. The District Court, noting that Mr. Grossman testified that the billing instruction was given *before* the events of the audit, concluded that a "permissible inference from [Mr. Grossman's] testimony is that [the Defendant] gave the instructions he did to Mr. Grossman to conceal sales to Cuba." 268 F. Supp. 2d at 418. We agree, and further believe that a rational jury who concludes that the billing instruction was given in 1992 could also infer therefrom that the Defendant desired those sales to continue. In our view, a rational jury viewing the evidence as a whole could conclude that it was *this* action by the Defendant which dictated how sales to Cuba were handled by the company in the 1994-1996 time-frame before the investigation began. At the very least this evidence suggests that the Defendant was willfully blind to the actions of the U.S. entity in the 1994-1996 period.

The second major supporting inference is tied to the events concerning the audit. While the District Court did not specifically explain why it rejected the government's inferences from this evidence, we conclude that it must have done so and did so improperly. A rational jury, especially one that has already indulged a negative inference against the Defendant in relation to the 1992 billing instruction, could infer that the Defendant (1) feigned ignorance to the auditor who discovered the Galax sale in 1993; (2) deliberately characterized Mr. Sabzali as a new employee (when he knew differently[28]) and initially resisted the need for a legal opinion

[28]The District Court, finding "no evidence that Mr. Sabzali had been with the company since 1990," emphatically rejected any inference that the Defendant lied or somehow misrepresented the truth to the auditors in 1993 when he characterized Mr. Sabzali as a "new" employee. *See* 268 F. Supp. 2d at 418 n.6. Such evidence is in the record however. Mr. Grossman testified on direct examination

on the effect of the Galax transaction, both in an effort to downplay the significance of the transaction; and (3) fired the auditors who discovered the Galax transaction, not out of dissatisfaction with their services, but rather because of their knowledge of that transaction. A jury that has indulged these reasonable inferences could also infer that the Defendant knew the U.S. entity was violating the law and was taking steps to ensure that future transactions would go unquestioned.

The third major supporting inference is tied to the future policy memorandum, which purported to set forth company policy regarding future sales to Cuba. This document was key to the both sides' theory of the case. The government urged one of two characterizations – either the document was a "sham" in that it was

---

that, by the time Mr. Grossman began his employment with the company in January 1991, Mr. Sabzali was already working in the Canada office. Additionally, the following exchange occurred during the cross-examination of Ms. Graves:

> Q: ... From about 1990 until 1996, Mr. Sabzali was the sales manager at the Purolite Canada office, is that correct?
>
> A: Yes.

A. 906 (Graves, cross-examination). If a jury found on the basis of this evidence that Mr. Sabzali had been with the company since at least 1990, it would be no leap to infer that the Defendant, as an active participant in company affairs, knew that Mr. Sabzali was not a "new" employee but deliberately characterized him as such to downplay the significance of the uncovered Galax transaction (in other words, to perhaps insinuate that Mr. Sabzali did not know any better and the illegal transaction would not reoccur).

59

shown to the auditors but not actually issued to the salesman, or it was "window-dressing" – i.e., a policy statement to which the company could point while simultaneously engaging in transactions with Cuba with the participation of the U.S. entity. The defense, on the other hand, pointed to the future policy memorandum as setting forth the Defendant's good-faith belief that the U.K. entity could trade with Cuba so long as the U.S. entity was not involved, and as evidence that, far from violating the law, he was trying to abide by it.[29] The District Court rejected the sham characterization, *see* 268 F. Supp. 2d at 418, and we agree there was insufficient evidence to support it. The District Court also rejected the window-dressing characterization, and it is here that we part company.

Attempting to understand the testimony related to the 1992 billing instruction in light of the future policy memorandum, the

---

[29]We believe that the text of the future policy memorandum reasonably could be viewed by a jury as refuting the Defendant's claim that he did not know it was illegal to ship Purolite product from the U.K. entity. It provides, in pertinent part: "While it is proper to ship this order from the UK in terms of UK law, it is contrary to USA policy and law to ship material of any kind to the island nation of Cuba in violation of the US embargo. ... No shipment of Purolite merchandise is to be shipped to, redirected to, or trans-shipped to Cuba."(emphasis added). The term "transship" means "to transfer for further transportation from one ship or conveyance to another." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (G. & C. Merriam Co. 1981). One could infer that shipments of Purolite product, to the extent they were physically shipped from the U.K. entity but otherwise handled in some manner by the U.S. entity (i.e., through sales, processing, etc.), were "transshipped" and hence under the proscription of both the future policy memorandum and the American Cuban embargo.

60

District Court appears to have viewed the latter as establishing a "new policy with respect to Cuba" – i.e., one that would counteract the 1992 billing instruction. 268 F. Supp. 2d at 418. Further, the District Court concluded there was "simply no evidence to support" the window-dressing characterization, and that "[t]he fact that during the period 1994 through 1996, there were sales to Cuba that at times involved the United States is not evidence that the [D]efendant intended the memorandum as a cover when there is not other evidence that he knew about the sales. Nor was there any evidence that [the Defendant] or anyone else followed up the memorandum with either written or oral instructions that it was to be ignored." *Id.* In our view, however, a rational jury viewing the evidence as a whole could draw the inference that the future policy memorandum was window dressing.

The window dressing inference depends for its reasonableness on all of the evidence put forth by the government in its case against the Defendant. It is not a strong inference, but a jury that has indulged adverse inferences against the Defendant related to the basic facts of the company, the billing instruction and the events of the audit (as well as from the "our friends in the Caribbean speech," the Sabzali performance review, the use of code words, and the post-investigation events, all of which we examine below), it would not be unreasonable to further infer that the future policy memorandum was intended to put a public face on a behind-the-scenes agreement by the principal actors to pursue sales to Cuba in violation of a known prohibition. While the District Court placed significant emphasis on Mr. Grossman's cross-examination testimony, such presented Grossman's understanding of the future policy memorandum; it would be up to the jury to square his testimony with all of the other evidence in determining if Grossman's understanding could be said to reflect the Defendant's intent. To our mind, there are a number of ways to read Mr. Grossman's testimony; to conclude that it may be

read *only* to negate a finding of intent by the Defendant is to overstep the judicial role. The court's obligation in the context of Fed.R.Crim.P. 29 is to ensure that any inferences arising from circumstantial evidence are reasonable, and we believe the window dressing inference is that.

3.     The "Our friends in the Caribbean" speech

Each side urged a different inference from the incident in which Mr. Sabzali, following a whispered comment by the Defendant during a sales presentation, substituted a reference to "the Caribbean" in place of his previous reference to Cuba. The government offered this evidence to show the Defendant engaged in an act of concealment from which one could infer guilty knowledge. The defense countered that any adverse inferences were unreasonable given the uncertainly as to what the Defendant said to Mr. Sabzali and when the incident occurred. Instead, the defense urged an inference that the event, if it occurred in 1993 (i.e., *after* the issuance of the future policy memorandum), merely showed the Defendant trying to comply with the law as he understood it and had directed it be followed in the future policy memorandum. The District Court rejected the inferences favored by either side as illogical, and moreover, deemed them both speculative due to the uncertainty of the Defendant's statement, his motive in speaking to Mr. Sabzali, and the date of the incident. 268 F. Supp. 2d at 419.

The District Court's handling of this circumstantial evidence, which we believe a rational jury could view as particularly strong against the Defendant, again invaded the province of the jury. While one does not know exactly *what* the Defendant said to Mr. Sabzali, a rational jury could reasonably infer the content of that statement based on the reaction of both men. A rational jury viewing the evidence as a whole could also draw a reasonable adverse inference

62

as to the Defendant's *motive* in speaking to his subordinate. Such inferences are not merely speculative, but have a logical and convincing connection.

Additionally, the weight and value of this evidence should not have been discounted due to uncertainty over when the incident occurred. A rational juror, by choosing to believe Mr. Gentile's testimony as given at trial or as given before the grand jury (and referenced during cross-examination at trial), could have accepted that this event occurred in 1992 before the audit and related events *or* in 1993 after the issuance of the future policy memorandum. Critically, we believe that an inference of concealment would be reasonable in conjunction with either date when put in the context of the evidence as a whole. Furthermore, the inference of concealment becomes even more reasonable when Mr. Sabzali's use of "Caribbean" during this incident – as apparently prompted by the Defendant[30] – is considered in light of the fact that many other employees of The Bro-Tech Company, at the time of the speech or later, understood "Caribbean" to be a code word for Cuba.

4.      Mr. Sabzali's performance review

The government urged a number of related inferences from the evidence of Mr. Sabzali's performance review and promotion – mainly, that the Defendant was aware of and approved of Mr. Sabzali's sales to Cuba, wanted to reward him for those sales, and

---

[30]We are not ourselves usurping the jury's role by insinuating that the Defendant actually told Mr. Sabzali during the whispered conversation to use the term Caribbean; we are merely suggesting that a rational juror could so infer or at least infer that the Defendant said something less direct but equally meaningful to Mr. Sabzali, who then himself chose the term Caribbean.

63

wanted such sales to continue as evidenced by the fact that, despite being promoted to a marketing position, Mr. Sabzali was to continue handling "the Caribbean sales." The defense pointed to testimony in the government's case tending to undercut the reasonableness of such inferences – mainly, that Don Brodie, not the Defendant, was in charge of North American affairs, thus making it more reasonable to infer that Don alone was responsible for Mr. Sabzali's promotion, and that Mr. Opperman was promoted by the Defendant to an international position, thus making it unreasonable to infer that the Defendant had a hand in a North American-related promotion like Mr. Sabzali's. In ruling on the motion for acquittal, the District Court acknowledged that a rational juror could conclude that the reference to "Caribbean" in the performance review meant Cuba, and that the Defendant read the performance review, saw the reference and knew therefrom that The Bro-Tech Corporation was selling product to Cuba. 268 F. Supp. 2d at 419. However, the District Court rejected any inference that the Defendant also knew, as a result, that the U.S. entity (as opposed to solely the U.K. entity) was actually involved in those sales. *See id*.

We agree that the evidence related to Mr. Sabzali's performance review would support the inferences identified by the District Court, but believe there are additional ones that might be drawn by a rational jury from the evidence as a whole. Specifically, we believe a jury could reasonably infer that the Defendant not only read the performance review, but approved of the underlying promotion, knew it was based on Mr. Sabzali's success in transacting business with Cuba, and intended to reward and thereby incentivize such sales in the future. We further part company with the District Court in terms of what this evidence may suggest about the Defendant's knowledge of the involvement of the U.S. entity in such sales. As all the evidence suggests that Mr. Sabzali was a star salesman in "the Caribbean," it would be not be an impermissible

64

leap to infer that an involved president of the company would know why that was so and how it was occurring.

5.      Use of code words

The government evidence shows a corporate culture pervaded by the use of code words for Cuba, and such naturally gives rise to an inference of concealment. *See Macko*, 994 F.2d at 1535 ("The one aspect of the operation that they kept secret was the Cuban connection. A jury could reasonably conclude that the defendants' secrecy about this single fact resulted from their knowledge of the Cuban embargo"). Importantly, the use of code words was attributed at least twice to the Defendant. First, in issuing the billing instruction to Mr. Grossman (whether that occurred in 1992 or 1993, after or in conjunction with the events of the audit), the Defendant asked Mr. Grossman to instruct the billing department not to include any reference to Cuba on the face of future invoices, and that instruction was given. A jury could reasonable conclude that this instruction either instigated or at least contributed to an overall corporate culture of deceit concerning transactions with Cuba. Second, it was the Defendant whose actions before a room of subordinate salesmen appear to have prompted Mr. Sabzali to refer to "Caribbean" instead of to Cuba. Again, we believe that a rational jury could conclude that the Defendant's reaction to Mr. Sabzali's use of the word Cuba either instigated or at least attributed to the overall corporate culture of deceit. Both were actions of the company's president, not some low-level employee whose behavior might be less influential. The use of code words, when viewed in conjunction with the other evidence in this case, tends to strengthen the overall inference that the Defendant was a knowing and willful participant in the conspiracy to trade with Cuba and understood that the U.S. entity was involved.

65

In an attempt to undermine the rationality of any adverse inference from the use of code words, the defense pointed to the fact that there was, simultaneously, rather open use of "Cuba" or "Havana" in company memorandum, sales documents and expense reports. There was also testimony elicited on cross-examination from a former product manager for The Purolite Company to the effect that he asked Mr. Sabzali not to use the word Cuba on anything sent to him. Finally, there was testimony from Mr. Grossman that The Bro-Tech Corporation had other customers in the Caribbean, although he could only recall one. Again, this evidence does tend to weaken the inference of concealment, but critically, does not render it completely unreasonable. The weight to be assigned the use of code words in this prosecution on circumstantial evidence is for the jury.

6.      Post-investigation events

The government urged that the Sabzali memorandum of February 28, 1997, showed that transactions involving Cuba conducted before the Customs agents' visit a few weeks prior involved the U.S. entity. In other words, there would be no need to explain in that memorandum "we now have to ship products from U.K." if such had already been the procedure. Similarly, there would be no need to explain that invoicing to the "customer in the Caribbean" would now be done directly "from Ponty" unless prior procedure had involved the U.S. entity. This memo was not carbon copied to the Defendant, but the government contended that a reasonable juror viewing the evidence as a whole could infer the Defendant's knowledge of its underlying premise (i.e., that sales before the investigation were conducted with the participation of the U.S. entity). From the fact that the Defendant was carbon-copied on Mr. Sabzali's February 28, 1997 and March 3, 1997 memoranda, the government urged an inference that the Defendant read these documents and thereby knew of the continued participation of the

66

U.S. entity in the sales occurring in early 1997 from the fact that Mr. Sabzali was now directing sales in "the Caribbean" from his office in Bala Cynwyd. The participation of the U.S. entity was certainly less (or at least on the decline) at this point, but as evidenced by these memoranda, still involved the U.S. entity's Bala Cynwyd office. The District Court never addressed whether any reasonable inferences against the Defendant arise from this evidence, having merely noted in a footnote the existence of the two memoranda carbon copied to the Defendant. Again, however, we believe that a rational jury viewing the evidence as a whole could use them to draw adverse inferences against the Defendant.

From the evidence of the Defendant's phone call to Ms. Graves, the government urged an inference of concealment and therefore of knowledge of past wrongdoing. The defense sought to undercut any adverse inference by noting a lack of evidence to suggest that the Defendant knew Ms. Graves would be interviewed by the government again and by urging that the critical statement – "if you can't remember the name, then you don't have anything to tell them" – be taken at face value as merely an innocent observation. In ruling on the motion, the District Court acknowledged that the government's inference as to the call to Ms. Graves was a "fair one," but ultimately assigned it no value, reasoning: "[This] inference does not shed any light on whether the defendant knew about the 1994 to 1996 shipments before or at the time they were occurring. This conversation took place two years after the government had started its investigation. [The Defendant] surely would have known about the shipments at that point ..." 268 F. Supp. 2d at 419. We agree that an inference of concealment is reasonable and further conclude that a rational jury viewing the evidence as a whole could further infer, as the impetus for the act of calling Ms. Graves, that the Defendant knew of the illegal sales activity during the relevant time frame. It is just as reasonable (if not more so) to infer that the Defendant was

67

seeking to conceal illegal activity involving the U.S. entity that predated the investigation of which he knew at the time he called Ms. Graves than it is to conclude he was seeking to conceal acts which he now understood to have been illegal. The mere fact that he chose to contact Ms. Graves in 1999 – a woman who, by virtue of her former position as a customer sales representative processing orders, might have seen orders involving transactions with Cuba – is itself important. Moreover, a rational jury viewing the evidence as a whole could certainly decline to interpret the Defendant's advice to Ms. Graves as benign, and instead view it as another instance of the Defendant attempting to conceal the Cuban transactions.

The government also urged an inference of concealment from the Defendant's reaction to Mr. Lugo's visit to the U.S. embassy. The District Court stated unequivocally that "a rational juror *could not make* a negative inference here" because "[t]he defendant was telling an employee to let him know if he is called in again to the U.S. Embassy because of a concern 'that U.S. officials would be asking [Lugo] questions without company counsel present.'" 268 F. Supp. 2d at 419-20 (emphasis added, brackets in the original). *See also id.* at 420 ("The Lugo discussion adds very little, if anything, to the government's case."). We acknowledge the uncertainty on the record about the timing of Mr. Lugo's visit to the embassy and whether the Defendant relayed his reaction thereto directly to Mr. Lugo, or through Mr. Sabzali. For present purposes, however, it is the reaction itself, coming sometime after the investigation was underway and presumably known to the Defendant, that is the key to the inference of concealment. A rational jury viewing the evidence as a whole need not have accepted the Defendant's explanation that the instruction to Mr. Lugo was borne solely of a concern with having counsel present. Instead, one could reasonably conclude that, like the veiled instruction given to Ms. Graves, the instruction to Mr. Lugo was motivated by a desire to conceal past wrongdoing.

68

### D. Willful Blindness

As explained above, we are satisfied that a reasonable jury could conclude beyond a reasonable doubt that the Defendant had actual knowledge of the law violated, the facts constituting the offense and the illicit purpose of the conspiracy. We also conclude that a reasonable jury could find the knowledge requirements of the crime met on a theory of willful blindness. Overall, the government's evidence paints a convincing picture of the Defendant as a company president who deliberately stuck his head in the sand regarding the involvement of the U.S. entity in the prohibited transactions. In particular, the evidence related to the billing instruction could be viewed as the Defendant trying to ensure that he never saw a direct reference to Cuba again, despite intending the transactions to continue. The corporate culture wherein Cuba was referred to by "code words," which a reasonable jury could attribute at least in part to the conduct of the Defendant, only aided him in his effort to ignore what should have been obvious. And while the Defendant repeatedly argues that the future policy memorandum and the events of the audit show him trying to discern and comply with the law, a jury might reasonably take note of the Defendant's failure to ask the "natural follow-up question[s]" when, for example, he did not question the reference to "Caribbean" on Mr. Sabzali's performance review, and never instigated any follow-up to the events of the 1992 audit report (as he suggested to Mr. Coulter that he would) or to his own instruction in the future policy memorandum, to ensure that his company was not transacting business with SDNs or with Cuba. *See Wert-Ruiz*, 228 F.3d at 257 (stating, in context of conviction for money laundering, that "the fact that [defendant] did not ask the natural follow-up question to determine the source of those funds could be reasonably considered by a jury to be evidence of willful blindness, especially when combined with the additional evidence"). The basic facts of the company structure also strengthen the willful

69

blindness inference in that it would not be unreasonable for a jury to infer that the Defendant was motivated to deliberately avoid learning the facts related to his company's trade with Cuba due to its profitability or his brother's involvement.  As in *Stewart*, where this Court concluded that a jury could have found that a defendant former law partner, who argued that he lacked the intent to defraud since he relied on solvency findings by third-party investigators, "could have recognized the likelihood of insolvency yet deliberately avoided learning the true facts," 185 F.3d 126, we conclude that the Defendant in this case could have recognized the likelihood that the U.S. entity was involved in illegal transactions with Cuba "yet deliberately avoided learning the true facts."

## IV.  CONCLUSION

Deciding a motion for judgment of acquittal in a conspiracy case built entirely on circumstantial evidence is not an easy task, and was made all the more difficult in this case by the complexities of the underlying substantive law and voluminous record.  Nonetheless, we conclude that because each of the interconnected inferences urged by the government is reasonable on the evidence as a whole, the District Court erred in entering the judgment of acquittal, and accordingly we

will vacate that judgment and reinstate the jury verdict subject to the District Court's conditional grant of a new trial.[31]

---

[31]Where a defendant has been acquitted on the ground of insufficient evidence to support the conviction, and this Court vacates the judgment of acquittal, the proper procedure is to reinstate the jury verdict. *See Coleman,* 811 F.2d at 805; *United States v. Dixon*, 658 F.2d 181 (3d Cir. 1981). We do so here, although we recognize that the District Court has already granted the Defendant a new trial pending the outcome of this appeal. If the Defendant is retried following our reinstatement of the verdict, "it will be the result of his own motion for a new trial, and not a process imposed upon him by the Government or this court," *Dixon*, 658 F.2d at 187, and thus there will be no issue of double jeopardy.